**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Catherine Yvonne ACKER,**
**Defendant–Appellant.**

No. 94–5246.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 3, 1995.

Decided May 3, 1995.

**ARGUED:** Edward Anthony Fiorella, Jr., Harkey, Lambeth, Nystrom & Fiorella, Charlotte, NC, for appellant. William A. Brafford, Asst. U.S. Atty., Charlotte, NC, for appellee. **ON BRIEF:** Mark T. Calloway, U.S. Atty., Charlotte, NC, for appellee.

Before WIDENER and HALL, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Reversed and remanded for a new trial by published opinion. Senior Judge CHAPMAN wrote the opinion, in which Judge WIDENER and Judge HALL joined.

## OPINION

CHAPMAN, Senior Circuit Judge:

Catherine Yvonne Acker was tried by a jury and convicted of the August 18, 1992 armed robbery of a Charlotte Branch of the First Citizens Bank in violation of 18 U.S.C. §§ 2113(a) and (d), for knowingly and unlawfully using and carrying a firearm during the commission of said robbery, in violation of 18 U.S.C. § 924(c)(1), and the September 28, 1992 robbery of the Kenilworth Avenue Branch of Wachovia Bank in Charlotte, North Carolina. At the same trial, she was acquitted of the charge of robbing the Tyvola Road, Charlotte, North Carolina branch of Wachovia Bank on December 24, 1992 and the May 19, 1993 robbery of Central Carolina Bank in Charlotte. She was sentenced to 51 months imprisonment for her bank robbery convictions, plus a consecutive 60 month sentence on the firearm count. Her appeal presents numerous claims of error, but we find merit in only one of these claims, which was the use of the prior consistent statement of a witness in violation of Fed.R.Evid.

801(d)(1)(B). We reverse the convictions and remand for a new trial.

## I.

The appellant was arrested on May 21, 1993 pursuant to a criminal complaint charging her with the May 19, 1993 robbery of the Central Carolina Bank in Charlotte. She participated in a lineup at the Mecklenburg County Jail on June 3, 1993 with five other black females. Each of these individuals wore a wig, sun glasses and a straw hat, which was the dress of the robber as described by witnesses at each bank. Each lineup participant was asked to say, "Hurry up, hurry up," and "Look lady, don't get hurt." Of the four witnesses from the August 18, 1992 robbery, three identified the appellant as the robber. From the September 28, 1992 robbery, the only witness to the lineup identified the appellant as the robber. All three of the witnesses to the December 24, 1992 robbery identified the appellant as the robber. Neither of the witnesses to the May 19, 1993 robbery identified the appellant. The three witnesses who failed to identify the appellant as the robber of any of the banks did not identify anyone else in the lineup as the robber.

Appellant was thereafter indicted for all four bank robberies, the firearms count and a one-count conspiracy with Samuel Holly to rob the Central Carolina Bank. Samuel Holly and appellant Catherine Acker lived together for approximately 25 years, but never married.

Appellant moved to sever the charges as to each bank robbery pursuant to Fed. R.Crim.P. 8(a) and 14. She claimed a misjoinder of offenses under Rule 8(a) and prejudicial joinder under Rule 14. These motions were denied.

Prior to trial, Holly entered into a plea agreement in which he agreed to enter a plea of guilty to aiding and abetting the Central Carolina Bank robbery and to testify for the prosecution in exchange for the dismissal of the conspiracy count and a recommendation for a probationary sentence. Appellant objected to Holly testifying against her, claiming that all confidential conversations be-

tween them were privileged under spousal immunity or the marital communications privilege. This motion was denied, and Holly testified for the prosecution.

Holly testified that appellant told him that she robbed the First Citizens Bank and the two branches of Wachovia Bank. She brought large amounts of money home after each of the robberies, and over time she explained to him various details of the robberies. Holly was a participant in the robbery of the Central Carolina Bank on May 19, 1993. He drove the get-away car, a brown Cadillac El Dorado. He also described the appellant's clothes at the time of the robberies, the wig, glasses and straw hat she wore and the approximate amount of money taken from each bank.

There were surveillance camera photographs from three of the robberies and other evidence, including the eye witnesses' identifications to support the jury verdict.

Holly was arrested after the May 19, 1993 robbery of Central Carolina Bank, but was not held in custody. On August 4, 1993, the appellant and Holly were charged in a superseding indictment. Holly was charged with conspiracy to rob the Central Carolina Bank and with aiding and abetting in the robbery of that bank. Holly had been questioned by Officer Mark Rozzi at the time of his original arrest in May 1993, but he denied participating in any of the robberies. However, he did indicate to Officer Rozzi that Catherine Acker might be involved and suggested that Rozzi talk with her.

On October 13, 1993, five months after his original arrest, two months after he had been indicted, and shortly before the scheduled date of his trial, Holly and his attorney met with Officer Rozzi in the attorney's office. At this meeting, Holly gave a statement that Acker committed the four robberies and described them in some detail. Shortly after providing this information to the government, Holly signed a plea agreement which allowed him to plead guilty to aiding and abetting the robbery of the Central Carolina Bank. The agreement also required the government to dismiss the conspiracy count

against Holly and the government agreed to recommend a sentence of probation in exchange for his testimony at Acker's trial.

Holly testified for the government and identified the appellant as the robber of each of the four banks. On direct examination, the prosecutor asked Holly if this testimony in court was the same as what he told Officer Rozzi when Rozzi interviewed him in October, 1993. Holly answered in the affirmative.

Later in the trial, Officer Rozzi was called as a government witness and gave information as to his investigation of the bank robberies. On direct examination by the Assistant United States Attorney, he was asked about his October, 1993 interview with Holly and Holly's attorney. The prosecutor asked Officer Rozzi if Holly told him in the interview the same things about each of the robberies that Holly had just testified to in court. Defense counsel objected:

Your Honor, I think this impermissible in corroboration. Mr. Holly testified. Now, the agent can't come in and state things that Mr. Holly may not have testified to.

The Court: Come on. Step up to the bench.

(Bench conference off the record).

The Court: All right. Under Rule 801(b)(1),[1] subsection (b), this witness will be permitted to testify in corroboration of what Mr. Holly said only, Agent Rozzi, as to whatever he has stated in the courtroom today. You cannot expand beyond that.

Prosecutor Brafford: Agent Rozzi, I am going to ask you if you think you are able to go through your report of your interview with Mr. Holly on October 13th and state what he said then only with respect to things he has also said here in court? Do you believe you can do that?

Agent Rozzi then testified in considerable detail about his October interview with Holly and all that Holly told him about the four bank robberies and Catherine Acker's role in these offenses.

Following approximately two and one-half days of testimony, the jury arguments and

---

**1.** The trial judge misspoke or the court reporter misunderstood what was said. There is no Rule 801(b)(1)(b) so the reference must be to Rule 801(d)(1)(B).

the instructions of the court, the jury retired to deliberate about 3:40 p.m. on Wednesday, November 17, 1993. The court adjourned at 5:15 p.m. and dismissed the jury with instructions to return the following day at 9:30 a.m. to resume deliberations. Shortly before court reconvened on Thursday, juror Brenda N. Revels called the Clerk of Court for the Western District of North Carolina and advised that she had injured her ankle in a fall the day before and would not be able to resume deliberations at the time ordered by the court because she had to seek medical attention.

Upon being informed of this call from the juror and not knowing the extent of her injuries or how long she might be unavailable or the length of any delay that might be occasioned, the district court, exercising its discretion under Fed.R.Crim.P. 23(b), excused the absent juror and allowed the eleven remaining jurors to reach a verdict. The jury found the appellant guilty of Counts 1, 2, and 3 and not guilty of Counts 4 and 5.

Appellant made a motion for judgment of acquittal, and in the alternative, for a new trial on the ground that the verdict by the eleven person jury violated her Sixth Amendment right to a unanimous verdict by a jury of twelve persons. This motion was denied, the appellant was sentenced and now appeals.

### II.

We find no merit to appellant's claims of misjoinder. Her motion was filed on September 29, 1993, and she claimed that joinder of the various counts in the indictment was not permissible under Fed.R.Crim.P. 8(a) and 14.

*Rule 8. Joinder of Offenses and of Defendants.*

*(a) Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

*Rule 14. Relief from Prejudicial Joinder.*

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

Appellant sought separate trials on each of the four counts arising out of the four separate bank robberies on the grounds that a joint consolidated trial would inevitably prejudice her, that the charges were not the same or of similar character, and that the charges were not based on the same act or transaction and did not constitute a part of a common scheme or plan. She claimed that she would be prejudiced because evidence admissible against her on one robbery count might not be admissible in a separate trial for the other robberies.

■ These motions of severance were denied. The court found that the defendant had not shown that joinder was manifestly prejudicial so as to outweigh the concern for judicial economy. Clearly the bank robberies were offenses "of the same or similar character" because the defendant's actions were essentially the same in each robbery. The costume or disguise she wore was the same in each case and her entire *modus operandi* clearly qualifies as being of "similar character," one of the tests set forth in Rule 8(a).

In her brief, appellant "acknowledges that the body of cases interpreting this issue have overwhelmingly permitted joinder" and cites numerous cases opposed to her present position. However, she argues that when we consider the number of robberies charged to her, the length of time between each robbery and her alleged confessions coming into evi-

dence through the testimony of her "common law husband," then severance is warranted. We must deny her request that we veer from a path so well established. The first robbery was on August 18, 1992, the second on September 28, 1992, the third on December 24, 1992 and the fourth on May 19, 1993. All involved a black female, apparently acting alone, and dressed in basically the same disguise at the time of each robbery. Appellant cites *United States v. Armstrong*, 621 F.2d 951 (9th Cir.1980), which cuts against her position and states:

> We have held that joinder is a rule rather than the exception and that the burden is on the defendant in his appeal following denial of a motion to sever to show that joinder was so manifestly prejudicial that it outweighed the dominate concern with judicial economy and compelled exercise of the court's discretion to sever.

*Id.* at 954.

■ Trial courts routinely allow joinder of different bank robbery counts against a single defendant in the same indictment. The trial court has a wide range of discretion in matters of severance which should be left undisturbed, absent a showing of clear prejudice or abuse of discretion. *United States v. McClintic*, 570 F.2d 685, 689 (8th Cir.1978). In cases where the offenses are identical or strikingly similar in the method of operation and occur over a short period of time, it is not an abuse of discretion to deny severance. *See United States v. DeBordez*, 741 F.2d 182 (8th Cir.), *cert. denied*, 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 707 (1984).

Each of these considerations support the district court's exercise of discretion in denying severance.

### III.

Catherine Acker and Samuel Holly lived together as man and wife for a period of approximately 25 years, during which time they lived in either New York or North Carolina. Neither of these states recognizes common-law marriage. *See People v. Massaro*, 288 N.Y. 211, 42 N.E.2d 491 (1942); and *State v. Lynch*, 301 N.C. 479, 272 S.E.2d 349 (1980). Appellant concedes that generally the claim of spousal privilege, whether it be the "adverse spousal testimony privilege" or the "marital communication privilege," must be supported by a valid marriage. However, she argues that under Fed.R.Evid. 501 [2] and the Equal Protection Clause of the Fourteenth Amendment, we should recognize her relationship with Holly as a valid marriage and thereby extend to her the same rights and privileges that are extended to married individuals in federal courts.

■ There are two types of marital privilege: the privilege against adverse spousal testimony and the privilege of protecting confidential marital communications. The adverse spousal privilege is vested in the witness-spouse, who may neither be compelled to testify nor foreclosed from testifying. *See Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). In this case, Holly was the alleged witness-spouse, and he elected to testify against Acker in order to fulfill his obligation under his plea agreement with the government.

■ The "marital communication privilege," if applicable and properly raised, is with the defendant and prevents a spouse from testifying against the defendant regarding confidential communications between the spouses. Acker argues that almost all of Holly's testimony consisted of confidential communications between the two of them, rather than observations that Holly made at the time and place of the alleged crimes, and that when she made these statements to Holly, she intended for them to remain confidential.

■ "The party asserting an evidentiary privilege, such as the *marital communications* privilege, bears the burden of establishing all

---

**2.** *Rule 501. General Rule*

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. . . .

of the essential elements involved." *See United States v. White*, 950 F.2d 426, 430 (7th Cir.1991). The first essential element that defendant must prove when claiming confidential marital communications privilege is the existence of a valid marriage between herself and the testifying witness. This she has failed to do. The marital communications privilege is in derogation of the truth, as are other evidentiary privileges; and therefore the "valid marriage" requirement must be interpreted strictly. *See United States v. Hamilton*, 19 F.3d 350, 354 (7th Cir.1994).

■ We do not interpret the language "in the light of reason and experience" contained in Rule 501 nor do we find anything in the Equal Protection Clause of the Fourteenth Amendment that will lead us away from the "bright line" rule that "marital communication privilege" must rest upon the foundation of a valid marriage. The light of present day experience may indicate that more couples are living together without the benefit of marriage, but reason dictates that before the courts extend a marital privilege to benefit a defendant, the defendant must have assumed both the privileges and the responsibilities of a valid marriage under the law of the state in which the privilege is asserted. The district court did not abuse its discretion in permitting Holly to testify against the defendant.

## IV.

■ Defendant contends that the district court abused its discretion in excusing Brenda Revels as a juror once the jury had begun its deliberations, the alternate jurors had been excused, and following Revels' telephone call to the Clerk of Court stating that she had been injured and was seeking medical attention. Appellant claims that juror Revels would have held out against the guilty verdicts, and that the district court should have conducted an evidentiary hearing on this issue as requested in her post-trial motion. Defense counsel originally did not object to proceeding with only 11 jurors, but after checking with his client he did register an objection, but did not move for a mistrial.

After trial, defense counsel contacted juror Revels and prepared an affidavit which she signed and in which she stated in part:

5. That upon leaving the Courthouse on Wednesday evening, it was my firm conviction that there was a reasonable doubt as to the defendant's guilt as to each and every count in the Bill of Indictment and that further deliberations would not have changed my convictions.

The trial court acted under the authority provided by Fed.R.Crim.P. 23(b):

(b) *Jury of Less Than Twelve.* Juries shall be of 12 but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12 or that a valid verdict may be returned by a jury of less than 12 should the court find it necessary to excuse one or more jurors for any just cause after trial commences. Even absent such stipulation, if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

This rule is a restatement of prior existing practice, the constitutionality of which was approved in *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). *See* Fed.R.Crim.P. 23(b) Advisory Committee's note.

Appellant's basic claim is that the trial judge excused the twelfth juror and proceeded with the remaining eleven without a showing of "just cause" as required by Rule 23(b).

We find no abuse of discretion by the district court in excusing juror Revels under the circumstances present at the time, and we find no error in the district court's decision to allow the remaining jurors to continue their deliberations. At the time the court acted, the judge observed that he, along with others, had observed the juror limping badly when she came into court on Wednesday, and persons were overhead speaking of ice packs on her ankle. The court did not know when this juror was likely to return. The court could not get in touch with her because it did not know where she was seeking medical

attention. The remaining jurors were present, ready to resume deliberations, and the alternate jurors had been excused and were no longer available. It would be unrealistic to require the trial judge to delay the trial awaiting further word from juror Revels. District courts must operate with judicial economy and considering all of the circumstances, there was just cause for the trial judge's action.

Appellant contends the court should have waited longer. However, the cases do not support such a position. *See United States v. Huntress*, 956 F.2d 1309 (5th Cir.1992) (psychological problem of a juror following only one day of deliberations), *cert. denied*, — U.S. —, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993); *United States v. O'Brien*, 898 F.2d 983 (5th Cir.1990) (juror dismissed because of a history of severe depression following less than one day of deliberations.)

■ Appellant claims that juror Revels would have held out for her acquittal and would not have voted for her conviction, but courts have consistently rejected juror affidavits or testimony about mental processes unless "extraneous prejudicial information" or "outside influence" is clearly present. This issue is covered by Fed.R.Evid. 606(b) which provides:

> *(b) Inquiry into validity of verdict or indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

There has been no showing of "extraneous prejudicial information" or "outside influence" being brought to bear on juror Revels or any other juror.

In *United States v. Gravely*, 840 F.2d 1156 (4th Cir.1988), we upheld the district court's denial of a defendant's request to interview jurors to determine if the pressure or lack of adequate time for deliberation was self imposed or the result of outside influence because the defendant made no threshold showing of improper outside influence. Efforts to impeach jury verdicts by post-trial contact with such jurors are disfavored. *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).

The clear language of the rule and the decisions in *Tanner* and *Gravely* support the action of the trial judge in denying a hearing based on the affidavit of juror Revels because it contained no indication of improper outside influence or claim that extraneous prejudicial information had been improperly brought to the jury's attention.

## V.

■ The district court clearly erred in permitting Officer Rozzi, over defendant's objection, to testify about the statements Holly made to him on October 13, 1993 concerning appellant's commission of the four bank robberies. The court admitted this evidence under the hearsay exception provided in Fed.R.Evid. 801(d)(1)(B) because it corroborated Holly's earlier testimony. The rule provides:

*Rule 801. Definitions*

The following definitions apply under this article:

*(a) Statement.* A "statement" is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.

*(b) Declarant.* A "declarant" is a person who makes a statement.

*(c) Hearsay.* "Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

*(d) Statements which are not hearsay.* A statement is not hearsay if—

*(1) Prior statement by witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

The rule obviously does not apply to prior statements of a witness introduced merely to "corroborate" testimony already given by the declarant and heard by the jury.

The statement given by Holly to Rozzi and about which Holly was allowed to testify was given on October 13, 1993, approximately five months after Holly had been arrested. The statement was also given after he was indicted for conspiring with the appellant to rob the Central Carolina Bank and while he and his attorney were attempting to negotiate a plea bargain which required his testimony against the appellant.

Rule 802 provides: "Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or act of Congress."

The testimony of Officer Rozzi as to what Holly had said at their interview on October 13, 1993 was clearly hearsay when it was repeated by Rozzi from the witness stand. It was "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

It was a prior consistent statement of the declarant (Holly), which is admissible only if it meets the test provided in Rule 801(d)(1)(B) that it is "(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of a recent fabrication or improper influence or motive." The testimony as to

Holly's out-of-court statement to Rozzi was admitted solely to corroborate what Holly testified to "in the courtroom today." A prior consistent out-of-court statement of a witness is not admissible for this purpose. In its recent decision of *Tome v. United States*, —— U.S. ——, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), the Supreme Court confined the use of a prior consistent out-of-court statement to the language of the rule. "Rule 801 defines prior consistent statements as nonhearsay *only* if they are offered to rebut a charge of 'recent fabrication or improper influence or motive.'" *Id.* at ——, 115 S.Ct. at 701 (emphasis added).

The Rules do not accord this weighty, nonhearsay status to all prior consistent statements. To the contrary, admissibility under the Rules is confined to those statements offered to rebut a charge of "recent fabrication or improper influence or motive," the same phrase used by the Advisory Committee in its description of the "traditiona[l]" common law of evidence, which was the background against which the Rules were drafted. Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited. In the present content, the question is whether A. T.'s out-of-court statements rebutted the alleged link between her desire to be with her mother and her testimony, not whether they suggested that A. T.'s in-court testimony was true. The Rule speaks of a party rebutting an alleged motive, not bolstering the veracity of the story told.

This limitation is instructive, not only to establish the preconditions of admissibility but also to reinforce the significance of the requirement that the consistent statements must have been made before the alleged influence, or motive to fabricate arose.

*Id.* (quoting Fed.R.Evid. 801(d)(1) advisory committee's notes).

The Court further found that the Rule embodies the common law premotive requirement that to be admissible, such prior consistent out-of-court statements must have been made prior to the charged recent fabrication or improper influence or motive.

In the present case, the government did not argue that it was submitting Holly's prior consistent out-of-court statement to rebut a charge of recent fabrication, and it went along with the judge's erroneous ruling that it was admissible as corroboration. The prosecution made no attempt to lay the foundation required by the Rule that such statement was made prior to Holly having a motive to fabricate. Such a foundation might be difficult on the present facts because the statement was made five months after Holly had been arrested and during an interview when he and his attorney were attempting to negotiate a plea bargain.

■■■ The government argues that the defendant failed to object when Holly himself initially testified about his statements to Rozzi on October 13, 1993, but this was not hearsay. Holly was testifying in court as to what he had said on another occasion. The government also argues that the prior statements should be allowed in corroboration of Holly's in-court testimony. The same argument was made by the government in *Tome* and the Court responded:

> The underlying theory of the Government's position is that an out-of-court consistent statement, whenever it was made, tends to bolster the testimony of a witness and so tends also to rebut an express or implied charge that the testimony has been the product of an improper influence. Congress could have adopted that rule with ease, providing, for instance, that "a witness'[s] prior consistent statements are admissible whenever relevant to assess the witness's truthfulness or accuracy." The theory would be that, in a broad sense, any prior statement by a witness concerning the disputed issues at trial would have some relevance in assessing the accuracy or truthfulness of the witness's in-court testimony on the same subject. The narrow Rule enacted by Congress, however, cannot be understood to incorporate the Government's theory.

*Id.* at ——, 115 S.Ct. at 702.

■■■ The government argues that admission of this statement was harmless error, but we cannot say that it was harmless beyond a reasonable doubt. The defendant

was tried on four counts of bank robbery and was acquitted on two of these counts, and we are in no position to say that, absent the hearsay testimony, she would not have been acquitted on the other counts.

For the reasons set forth above, the judgment of conviction is reversed, and the case is remanded for a new trial.

*REVERSED AND REMANDED FOR A NEW TRIAL.*