**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4374

JONATHAN MARK JONES,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frank A. Kaufman, Senior District Judge.
(CR-94-281-K)

Submitted: November 17, 1998

Decided: January 12, 1999

Before ERVIN and WILKINS, Circuit Judges, and
HALL, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Beth M. Farber, Acting Federal Public Defender, Joseph A. Balter,
Deputy Assistant Federal Defender, Baltimore, Maryland, for Appel-
lant. Lynne A. Battaglia, United States Attorney, Andrew G. W. Nor-
man, Assistant United States Attorney, Andrew Clayton White,
Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Jonathan Mark Jones appeals his jury convictions of attempted bank robbery, bank robbery, and related firearms offenses and his resulting sentence. He attacks the trial court's denial of motions to suppress evidence, to sever his trial, and for judgment of acquittal. Because we find no error in the court's denial of these motions, we affirm Jones's convictions and sentence.

On June 6, 1994, two armed black males attempted to rob a First National Bank of Maryland in Baltimore. Both men carried machine pistols and wore dark clothing and dark ski masks. They also covered the lower portions of their faces with dark cloths. One was described as 5'8" to 5'10" tall with a thin build and light to medium black complexion; the other was described as 6' tall with a heavier build. One witness testified he believed both were African-American. The men fled the bank through the back door without taking any money when an alarm went off.

On June 8, 1994, two armed men robbed the Maryland National Bank in Towson. Both robbers were armed with machine pistols and wore rubber gloves, dark ski masks or hoods, and sweat-type clothing. Both robbers were black. One was described as taller with a heavier build than the second robber, who was between 5'8" and 6' tall and thinner in build with a lighter complexion. Police and FBI agents who responded on the scene learned that the bank security guard was disarmed of his revolver; that bank employees filled a gray duffle bag with bank currency; and that a bank dye pack placed in the bag detonated as the robbers escaped.

A security guard chased the robbers down the street and saw them get into a pick-up truck driven by a third African-American. One entered the rear flatbed area of the truck and hid under a tarp while

2

the other entered the front driver's side. A third, and possibly a fourth, black male were noted in the truck. Another witness noted that the truck was a black Toyota with a Maryland license number 102048.

With this information, police reviewed Maryland motor vehicle records and determined that the vehicle was registered to Kittrell Decator, an African-American male, and Rita Decator Homes, an African-American female. Further search of utility records disclosed that Kittrell Decator had utility services listed in his name at 2349 Eutaw Place, an apartment building in Baltimore, a different address from the one noted in Maryland motor vehicle records.

On June 8, Baltimore police began surveillance at the Eutaw Place address. That afternoon, police observed a dark green Toyota Camry traveling in the alley at the rear of Eutaw Place, where it was parked. Several minutes later, detectives stopped the car as it pulled away. The detectives identified themselves as police officers, requested that the occupants of the car keep their hands in view, and asked them for identification. The driver produced a Maryland driver's license identifying him as Kittrell Decator, and the passenger produced identification indicating he was Jonathan Mark Jones. Decator informed one of the officers that the Camry was a rental car and that he had taken his truck to a repair shop earlier that day.

Upon learning that Decator, the registered owner of the getaway truck used that morning in the bank robbery, was an occupant of the Camry, the detectives asked both to step out of the car. The detectives observed that the passenger, Jones, was taller and heavier than Decator, which matched the physical description of the two men who robbed the bank earlier that day. The officers patted both men down for weapons and found none. The two were then independently interviewed. Neither was handcuffed or informed that he was under arrest.

Detective Ziegler interviewed Decator in front of his car. He informed him that he had some questions about Decator's truck, but before asking him any specific question, he apprised Decator of his Miranda rights and informed him that he was not under arrest. Decator acknowledged that he understood his rights and agreed to speak with the officer. When informed that his truck had been used in a robbery, Decator claimed that the truck had been stolen earlier that day.

3

Meanwhile, Jones informed police that the truck had been parked near Pressman Street an hour or two earlier.

As Decator was being interviewed, Detective Ballard confronted him with the inconsistencies regarding the whereabouts of the truck. Decator then became nervous and agitated. Shortly after Decator received his Miranda warnings and was interviewed, another detective found dye-stained white surgical gloves on the driveway pad at the rear of 2348 Eutaw Place. The gloves were consistent with those worn by the bank robbers, and the red dye was consistent with that of an exploding dye pack. Jones and Decator were then arrested.

Police seized a digital pager Decator was wearing when he was arrested. While the beeper was in Detective Ziegler's possession, it went off, and Ziegler accessed the numbers contained in the beeper's memory. One frequent number was traced to the switchboard of a Howard Johnson Motel in Baltimore County. Officers were dispatched to the motel to ascertain the room from which the calls originated.

The officers seized the Camry and towed it to police headquarters. Inside the trunk of the car, officers found a black backpack containing two loaded machine pistols, the bank guard's loaded revolver, a box of latex surgical gloves, two black nylon face masks, and a sweatshirt with a crossed-oar design that had been described to investigators by bank employees as being worn by one of the robbers.

Officers dispatched to the Howard Johnson Motel observed Craig Lamont Scott leaving the hotel. As he left, he walked directly in front of FBI Agent Dougher, who was openly wearing his gun and badge. Scott was carrying a gray duffle bag. Scott ignored Dougher's requests to stop and eventually entered a shopping mall. Dougher followed Scott into the mall and observed him making a call from a pay phone. When Scott finished his call, Dougher approached him, identified himself as an FBI agent, and asked to speak with him. Scott asked Dougher where his badge was and pointed to the agent's left breast pocket. (Dougher had placed his gun and badge out of view in order not to alarm patrons of the mall.) Fearful that Scott might be armed, Dougher asked Scott to put the bag on the ground. Scott turned and started to run, and Dougher grabbed him by the arm. Scott

4

then hit Dougher in the head with the duffel bag, the bag fell, and Scott fled. Dougher eventually caught up with Scott in a Marshall's department store, where a struggle ensued. Scott was finally apprehended with the help of a store security officer.

Detective Folio recovered the duffel bag. Suspecting that it might contain a loaded weapon, he opened it and discovered that it contained a large amount of cash (approximately $113,000). Next to the bag, he found a plastic bag containing money wrappers and money bands from the Maryland National Bank. Scott was then arrested. A search of Scott's person pursuant to the arrest uncovered a key to room 504 at the Howard Johnson Motel, a room receipt, and other papers (among which was a business card in the name of Kittrell Decator).

Believing that a fourth robbery suspect could still be at large, officers entered Room 504 of the Howard Johnson's and found no one there. They secured the room and later obtained a search warrant. The subsequent search disclosed Scott's fingerprints on the phone and dye-stained towels.

Based upon this evidence, a jury convicted Jones of the attempted bank robbery, bank robbery, and use of a firearm in the commission of both crimes. Jones was sentenced to 17 years and 3 months' incarceration.

Jones first asserts that the police stop of the vehicle in which he was a passenger was not supported by reasonable suspicion and that his resulting arrest was not supported by probable cause. We review the district court's legal conclusions de novo and its factual findings for clear error. See United States v. Williams , 10 F.3d 1070 (4th Cir. 1993). A brief, investigatory, warrantless stop of a car is permissible if an officer has reasonable suspicion, based on specific and articulable facts, that the car's occupants have committed a crime. See Terry v. Ohio, 392 U.S. 1, 10 (1968); United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). If the investigatory stop is reasonably related in scope to the circumstances which justified the interference, the stop is constitutionally permissible. See United States v. Sharpe, 470 U.S. 675, 682 (1985).

Law enforcement officers stopped the Toyota Camry in which Jones was a passenger because they reasonably suspected that the car's occupants might have been involved in the bank robberies. The Camry had recently arrived at and was then departing from the Eutaw Place address to which the license plate of the bank robbers' getaway truck had been traced. It was therefore reasonable for the officers to believe that the registered owner of the getaway truck, Decator, might have been involved in the bank robbery and that Decator was either the driver of the Camry or its passenger.

An arresting officer must have probable cause to believe that the person arrested has committed an offense; such probable cause exists if "at the moment the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). Once the officers discovered that Decator was an occupant of the car, they permissibly asked the two men to exit the vehicle and separated them to be interviewed. When the men got out of the vehicle, it was then apparent that they met the physical description of the robbers. The two men then provided inconsistent accounts concerning the whereabouts of the truck. During questioning, Decator asked that Jones throw him the keys to the truck, which he did. Finally, the officers discovered dye-stained surgical gloves in the driveway where the Camry had been parked. We conclude that all of these factors provided sufficient probable cause to arrest Jones.

Next, Jones asserts that the court abused its discretion in denying his motion to suppress statements he made at the police station after previously invoking his right to remain silent at the scene of his arrest. He asserts that the statements were admitted in violation of Miranda v. Arizona, 384 U.S. 436 (1966). When police honor an accused's right to remain silent by immediately ceasing interrogation and recommencing questioning only after a significant lapse of time and fresh warnings, the accused may waive the right to remain silent he previously asserted. See Michigan v. Mosley, 423 U.S. 96, 106 (1975); United States v. House, 939 F.2d 659, 662 (8th Cir. 1991). The court must weigh three factors in assessing whether continued questioning after an initial refusal to answer questions was appropriate: (1) whether there was an immediate cessation of questioning

6

upon defendant's request; (2) whether a "significant amount of time" had passed since the last session and a new set of warnings given; and (3) whether the second interrogation involved inquiries concerning a separate crime. Id.

Jones initially invoked his right to remain silent at the scene of the traffic stop following advice of his Miranda warnings, and all questioning of him stopped. Neither was there any interrogation following his arrest during the ride to the police station. Almost two hours later, Detective Marcin, who was not one of the officers who initially questioned Jones, advised Jones of his Miranda rights and interviewed him. Jones initialed each individual right on the rights waiver. Though the questions were not about a different crime, courts have held that "a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." House, 939 F.2d at 662. We find no abuse of discretion in either the court's balancing of the Mosley factors or its decision to admit Jones's statements.

Jones asserts that the trial court erred in declining to sever his trial on two counts related to the attempted bank robbery from the trial on the counts related to the second bank robbery. The trial court has a wide range of discretion in severance matters which we do not disturb absent a showing of clear prejudice or abuse of discretion. See United States v. Acker, 52 F.3d 509, 514 (4th Cir. 1995) (citation omitted). In cases in which the offenses are identical or strikingly similar in the method of operation and occur over a short period of time, it is not an abuse of discretion to deny severance. Id. Our review of these considerations supports the district court's denial of severance. We agree with the district court's assessment that the June 6 attempted bank robbery and the June 8 bank robbery were sufficiently similar in method and close enough in time that there was no abuse of discretion in denying the motion for joinder.

Finally, Jones contends the court improperly denied his motion for judgment of acquittal on the grounds that the evidence was insufficient to support his convictions related to the June 6 attempted robbery. We must sustain a jury verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

7

As we previously noted, the June 6 attempted robbery and the June 8 robbery were factually similar in several respects. In addition, when one of the investigating officers noted the similarity between the June 6 attempted robbery and the June 8 robbery during an interview with Jones, Jones stated that the June 6 incident "wasn't a robbery because they didn't get any money." This fact would not have been known by anyone who was not a participant in the robbery. Construing this evidence in the light most favorable to the Government, we conclude it is sufficient to sustain Jones's jury convictions for attempted bank robbery and use of a firearm in that attempt.

For these reasons, we affirm Jones's jury convictions and sentence. We dispense with oral argument because the facts and legal contentions of the parties are adequately presented in the materials before the court and argument would not aid the decisional process.

AFFIRMED

8