**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 03-4960**

─────────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BENNIE LYNN ISOM,

Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Middle District of North Carolina, at Durham.  William L. Osteen, District Judge.  (CR-03-241; CR-03-242)

─────────────

Argued:  February 4, 2005                Decided:  July 12, 2005

─────────────

Before WILKINSON and WILLIAMS, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** Robert Lynn McClellan, IVEY, MCCLELLAN, GATTON & TALCOTT, L.L.P., Greensboro, North Carolina, for Appellant.  Lisa Blue Boggs, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:** J. Marshall Shelton, IVEY, MCCLELLAN, GATTON & TALCOTT, L.L.P., Greensboro, North Carolina, for Appellant.  Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Bennie Lynn Isom was indicted in two separate indictments for bank robbery, one for the April 18, 2002, robbery of the Fidelity Bank (Fidelity) in Greensboro, North Carolina, and the second for the April 29, 2002, robbery of the Central Carolina Bank and Trust Company (CCB) located in Asheboro, North Carolina. Each of the indictments charged Isom with bank robbery, in violation of 18 U.S.C. § 2113(a)(West 2000), robbery accomplished by means of a handgun, in violation of 18 U.S.C. § 2113(d)(West 2000) and brandishing a firearm, in violation of 18 U.S.C. § 924(c)(1)(a)(ii) (West 2000).

On August 11, 2003, the Government moved to join the two indictments for trial. Isom subsequently filed a Motion for Relief from Prejudicial Joinder, a Motion to Suppress Out-of-Court Identification, a Request for a Physical Line-up, and a Motion for Further Discovery and Inspection.

After a hearing on the pending motions, the trial court granted in part and denied in part Isom's Motion to Suppress Out-of-Court Identification. The trial court also denied Isom's Motion for Relief from Prejudicial Joinder and ordered that the two cases would be joined for trial. At the end of the three day trial, the jury found Isom guilty of all counts.

For the reasons explained below, we hold that joinder was proper under Fed. R. Crim. P. 8(a) and that the district court did

3

not abuse its discretion in denying Isom's motion to sever under Fed. R. Crim. P. 14(a). We further hold that the photographic line-up at issue was not impermissibly suggestive. We also conclude that the district court did not commit any reversible error in its management of the witness testimony during the trial of this case and that the trial court properly admitted Isom's letter written to his alibi witness. Accordingly, we find that Isom's challenges to his conviction are without merit, and, thus, affirm his conviction.

## I. Factual Background

At approximately 2:56 p.m., on April 18, 2002, a black male entered Fidelity alone. Fidelity is a federally insured bank located on Farmington Road in Greensboro, North Carolina. (J.A. at 109-11, 216, 249-50, 708-14.) The individual was described as wearing a dark shirt, sunglasses, a black baseball cap, and a white sweatband or clothing around his neck. (J.A. at 211, 248; Supp. J.A. at 1-2.) In addition, his facial skin was described as being "a little rough on the sides." (J.A. at 222.)

Ms. Owanna Waclawek, a teller with Fidelity, offered to assist the individual. He requested change for a ten and twenty dollar bill. After Ms. Waclawek made change, the individual requested to cash a money order. (J.A. at 211.) Because the individual did not have an account with Fidelity, Ms. Waclawek advised him that he

4

could cash his money order at the post office.  (J.A. at 209-11, 244.)  It was at this point that Mrs. Hilda Chadwick, a co-teller, began giving the individual directions to the post office. (J.A. at 244.)

The individual then brandished a gun and demanded money and an ATM bag.  (J.A. at 212-13, 227-28, 244-46.)  Ms. Waclawek and Mrs. Chadwick complied with the individual's demands.  (J.A. at 213-14, 242, 246.)  The individual threatened to shoot the tellers if they continued to look at him.  (J.A. at 213, 246.)  The individual then ordered the tellers to walk to the back.  He then fled, taking $12,674.  (J.A. at 232, 246-47.)

At approximately 1:06 p.m., on April 29, 2002, two black males entered the CCB.  The CCB is a federally insured bank located on Dixie Drive in Asheboro, North Carolina. (J.A. at 814-826.)  The first individual asked Ms. Cindy Ellison, the teller, to make change for both a twenty and a ten dollar bill.  He repeated his request three times after looking over at the second individual. (J.A. at 290, 305; Supp. J.A. at 17-18.)  Ms. Ellison later identified the second individual as Benny Isom (J.A. at 301.)  Ms. Ellison described him as a tall African-American male with a baseball cap worn backwards.  (J.A. at 298, 296.)  One teller, Ms. Karen Goley, described him as wearing a white turtleneck while another, Mrs. Emily Dalton, described him as wearing a thick wristband around his neck. (J.A. at 354, 373.)

The second individual pulled out his gun first, followed by the male requesting change. (J.A. at 294, 305.) The male requesting change demanded money from Ms. Ellison. The second individual walked behind the teller line and demanded that all drawers be opened. (J.A. at 295-96.) The individuals took money from both Ms. Ellison and Mrs. Dalton's drawers. (J.A. at 322, 397.) The second individual ordered Ms. Ellison, along with the two other bank employees, to lie on the floor. (J.A. at 296-97.) The individuals left, taking $8,304 from Mrs. Dalton's drawer and $27,688 from Ms. Ellison's drawer.

The individuals fled to the Laser Car Wash, located in the same strip mall as the bank, and got into a black BMW parked at the car wash. (J.A. at 410, 415.) The customer witness, Ms. Angela Nixon, stated that the men fled from the bank to the car wash at approximately 1:15 p.m. She also indicated that she saw the men changing shirts. (J.A. at 410, 415.) Ms. Nixon told police that the first letter of the license plate on the BMW was a "P." (J.A. at 410, 428.) The owner of the car wash, Mr. James Woods, acknowledged seeing the black BMW parked in the lot before his lunch break and noted that it was gone by the time he returned from lunch. (J.A. at 408.)

On June 28, 2002, Detective Jay Landers of the Greensboro Police Department met with Benny Isom. Isom identified himself as Darryl Young and produced a driver's license, issued on April 2,

6

2002, with a Charlotte address, and in the name of Darryl Young. (J.A. at 506.) The actual Darryl Young testified that he met Isom while walking in Charlotte.

At trial, Young stated, "[Isom] asked me did I have an ID, and he asked me can I give him a hotel - - get a hotel room for him. . . . [a]t first I was hesitant, then after he promised me some money, I did it." (J.A. at 489.) Young also testified that, after Isom gave Young a ride to Wal-Mart, they went to Young's residence. One to two days following Isom's visit to his residence, Young discovered that his driver's license was missing. (J.A. at 491.)

While at Isom's apartment, Detective Landers observed a black BMW in the parking lot. (J.A. at 504-05.) Upon inquiry, Isom stated that the vehicle belonged to Sabrina Armstrong. (J.A. at 506.) After running the license plate, however, Detective Landers discovered that the car was registered in the names of both Sabrina Armstrong and Darryl Young. (J.A. at 506.) Detective Landers then requested a meeting with Isom (who continued to use the alias of Darryl Young). Isom failed to arrive for the meeting. (J.A. at 508.)

At some point, Detective Landers discovered that the BMW was purchased at Shima Auto Sales. On July 24, 2002, he spoke with the owner of Shima Auto Sales, Ed Ghattan. (J.A. at 508-09.) Ghattan informed Detective Landers that the BMW had been traded in for a Nissan 300ZX and that he had the BMW at his residence. The

7

trade occurred on June 29, 2002, one day after Detective Landers questioned Isom about his black BMW. (J.A. at 505-06, 832.)

Detective Landers photographed the BMW. It had the same license plate number as the BMW registered to Armstrong and Young. (J.A. at 509-10, 849-51.)

On July 26, 2002, Detective Landers met Isom at the residence of Isom's girlfriend, Shanetta Gillies. A Nissan 300ZX was parked in front of the residence. (J.A. at 511.) During a search of the residence, Detective Landers found a driver's license and social security card in the name of Darryl Young. (J.A. at 512.) After running the driver's license through the Department of Motor Vehicles (DMV), Detective Landers learned that the DMV possessed two individual's files for that driver's license number, including a Darryl Young with a Charlotte address. (J.A. at 513.) Isom was arrested and fingerprinted on unrelated charges. At this point, Detective Landers learned that the person he knew as Darryl Young was actually Benny Lynn Isom. (J.A. at 514-15.)

Isom told Detective Landers that he was unemployed and had moved out of his old address on July 12, 2002. Ghattan testified in court that he had employed Isom two weeks after selling him the black BMW. (J.A. at 612.) Isom also stated that he went to the DMV to obtain a new license on that day because the name of Darryl Young was no longer valid. (J.A. at 516, 544.)

8

On August 28, 2002, Detective Landers presented Mrs. Chadwick with a photographic line-up that included a photo of Isom. Mrs. Chadwick identified Isom as the individual in the Fidelity bank robbery. (J.A. at 545.) Detective John Thompson of the Asheboro Police Department showed the same line-up to Ms. Ellison. Although Ms. Ellison identified Isom in the first photo line-up, she identified another individual, the actual Darryl Young, in the second photo line-up. (J.A. at 302-03, 431-33.)

Isom's former landlord, Ramon Ganim, recognized Isom as the person who rented an apartment from him on Flint Street on March 1, 2002, and testified that Isom owned a dark blue or black BMW. (J.A. at 474-75, 480.) Ganim also recognized the second individual in the bank surveillance photograph from the CCB robbery as looking like Isom. (J.A. at 481-82; Supp. J.A. at 21-22.)

Isom's estranged wife, Sadie Isom, identified the individual photographed in the Fidelity and the CCB robberies as her husband. (J.A. at 572-75; Supp. J.A. at 3-4, 7-8, 11-12, 19-20, 23-24.) Mrs. Isom was able to identify her husband based on his physical features and his mannerisms. (J.A. at 576.) Mrs. Isom also identified her husband, Benny Isom, in court. (J.A. at 576.)

Mahmoud Gavgani, Isom's co-worker at Shima Auto Sales, identified Isom as the person claiming to be Darryl Young. (J.A. at 444-45.) When Isom purchased the Nissan 300ZX in exchange for the black BMW, Gavgani agreed to put the title of the vehicle in his

9

own name. (J.A. at 449.)  Gavgani also identified the individual in the bank surveillance photograph from the CCB robbery as looking like Isom.  (J.A. at 456-59; Supp. J.A. at 23-24.)

At trial, the jury was afforded the opportunity to compare Isom's neck and forearm to the pictures of a tattoo on Isom's neck and a scar on his arm. (J.A. at 854-55, 859-860; Supp. J.A. at 31-38.)

Isom relied on the testimony of Ghattan for his alibi defense at trial.  Ghattan indicated that Isom's hours were from approximately 9:30 a.m. to 5:00 p.m.  (J.A. at 615.)  However, he did not specifically remember Isom's presence at work on April 18, 2002, or April 29, 2002. (J.A. at 639.)  Furthermore, Ghattan acknowledged that he generally stayed in his own office, sometimes for more than two hours at a time.  (J.A. at 618.)  Ghattan admitted to FBI Agent Brereton that Isom could have been absent from work for two to three hours without his knowledge. (J.A. at 645-46, 647.)

## II.

### A.  Rule 8(a)

Isom first maintains that the district court erred in joining the two robbery cases together.  The Government counters this argument with its contention that the two indictments in the case at bar were properly joined on the basis that the two robberies

10

"are of the same or similar character . . . or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Since joinder pursuant to Rule 8 is a question of law, we review such joinder de novo. United States v. Mackins, 315 F.3d 399, 412 (4th Cir. 2003).

When called upon to determine whether joinder is proper pursuant to Rule 8(a), the court considers the facts and circumstances of the joined charges to ascertain whether they are sufficiently similar or part of a common plan or scheme. In our review of the evidence before us, we find that the two robberies are sufficiently similar and part of a common plan or scheme.

Both robberies commenced in the same fashion: with the request for change of a twenty and a ten dollar bill. Both robberies also included the brandishing of a gun. In addition, in both robberies, cash was taken from two tellers. Moreover, the individual who robbed Fidelity was wearing some of the same or significantly similar clothing to the second individual in the robbery of the CCB. That is, the individual who robbed Fidelity was wearing a black baseball cap that was substantially similar, if not identical, in color and marking, to the cap worn by the second individual in the CCB robbery. Both of these individuals also wore a dark shirt and a white band around his neck.

Since we find that the robberies "are of the same or similar character . . . [and] constitute parts of a common scheme or

11

plan[,]" Fed. R. Crim. P. 8(a), we conclude that the joinder of the two different indictments was appropriate. Accordingly, we must next consider whether the district court erred in denying Isom's motion to sever pursuant to Fed. R. Crim. P. 14(a).

## B. Rule 14(a)

After the offenses are properly joined under Rule 8(a), the district court may, in its discretion, sever the offenses if the defendant establishes substantial prejudice pursuant to Fed. R. Crim. P. 14. United States v. Foutz, 540 F.2d 733, 736 (4th Cir. 1976). Rule 14(a) provides that, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The district court's decision to deny a motion to sever will not be overturned absent a "showing of clear prejudice or abuse of discretion." United States v. Acker, 52 F.3d 509, 514 (4th Cir. 1995).

"In ruling on a motion for severance, the trial court is vested with discretion; it must carefully weigh the possible prejudice to the accused against the often equally compelling interests of the judicial process, which include the avoidance of needlessly duplicative trials involving substantially similar

12

proof." United States v. Jamar, 561 F.2d 1103, 1106 (4th Cir. 1977)(citing United States v. Isaacs, 493 F.2d 1124, 1160 (7th Cir. 1974)). "The exercise of this discretion will be overturned only for clear abuse affecting substantial rights of the accused." Id. (citing Cataneo v. United States, 167 F.2d 820, 823 (4th Cir. 1948)). It is not an abuse of discretion to deny severance "[i]n cases where the offenses are identical or strikingly similar in the method of operation and occur over a short period of time." Acker, 52 F.3d at 514.

As already noted, the Fidelity robbery occurred on April 18, 2002. The CCB robbery occurred just eleven days later, on April 29, 2002. Thus, it can reasonably be said that the two offenses "occur[red] over a short period of time[.]" Id.

In answer to the question of whether "the offenses are identical or strikingly similar in the method of operation," Id., we find in the affirmative. In the instant case, the individual purported to be Isom is wearing similar clothing in each of the robberies--including a dark shirt, a white neckband, and a black baseball cap with the same or similar logo. Moreover, each robbery commenced in the same fashion, with the asking of change for twenty and ten dollar bills. Also, in each of the robberies, a gun was used and cash was taken from two tellers. Thus, we conclude that the two robberies are "strikingly similar in the method of operation." Id.

13

The Government contends that two separate trials in this case would involve duplicative trials and substantially similar proof. We agree. If these two robberies had been tried separately, Isom's wife, Sadie Isom would have been required to testify twice. Also, Ghattan, Isom's alibi witness, would likely be called as a witness at each trial, as would Greensboro Detective Landers. Ganim, Isom's former landlord, and Gavgani, Isom's co-worker at Shima Auto Sales, would likely be listed as witnesses at both trials. In addition, the Government has indicated that F.B.I. Agent Brereton would be a possible rebuttal witness in both trials.

Moreover, the Government has stated that, had this case been severed, it would have requested a Fed. R. Evid. 404(b) ruling so as to allow the evidence of the CCB robbery to be entered into evidence during the trial of the Fidelity robbery and vice versa.

It is well settled that "other crimes" are inadmissible when offered for the sole purpose of proving a defendant's criminal disposition. Fed. R. Evid. 404(b). Nevertheless, "[o]ne inevitable consequence of a joint trial is that the jury will be aware of evidence of one crime while considering the defendant's guilt or innocence of another." Foutz, 540 F.2d at 736. However, "[i]n . . . instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together." Id. (footnote omitted). That is, if evidence from both

14

of the robberies is admissible in each of the trials, the force of any claim that Isom has regarding prejudice is severely weakened. See United States v. Bragan, 499 F.2d 1376, 1380 (4th Cir. 1974).

Isom's identity is at issue in the case at bar. Sadie Isom, Isom's estranged wife, identified Isom from the bank surveillance tapes from each of the robberies. In explaining how she made the identification, Ms. Isom noted "[t]he shape of his head, certain mannerisms, the upper torso[,]" and the way that he sometimes held his mouth. (J.A. at 576.) Moreover, while explaining at trial how she identified Isom, Cindy Ellison, one of the victim tellers in the CCB robbery, also stated that she observed "the way his mouth was shaped." (J.A. at 162.) Furthermore, Ramon Ganim, Isom's former landlord, and Mahmoud Gavgani, one of Isom's co-workers at Shima Auto, each testified that the second individual in some of the bank robbery surveillance photographs from the CCB robbery looked like Isom.

In addition, the pictures of Isom taken by Detective Landers reveal a tattoo of a "B" on Isom's neck, as well as a scar on his arm, both of which are visible, although not as clear, in the surveillance tapes from the Fidelity robbery.

If the district court had ruled in favor of the Government on its Rule 404(b) request, and we think that it would have properly done so, then much of the evidence in the first trial would likely

15

be admissible in the second one.  This weighs heavily in favor of the Government.

Isom relies heavily on Foutz, 540 F.2d at 733, for his contention that the Fidelity and the CCB robberies should not have been tried jointly.  In Foutz, this court held that joinder was improper on the basis that there was no direct evidence connecting the defendant to both crimes, the evidence introduced as to one offense would not have been admissible in a trial as to the other offense, and the only evidence presented to show a similarity was the fact that the same bank was robbed both times.  Isom argues that the similarities in Foutz and the instant case "are striking." (Appellant's Supp. Br. at 2.)  We are unconvinced.

The two robberies in the case at bar occurred within eleven days of each other; in Foutz, the time difference was two-and-a-half months.  Also, the similarities between the two robberies here, as discussed below, are much more profound than the similarities in Foutz.  In addition, in the case sub judice, the clothing worn by Isom in the second robbery was, in many respects, almost identical to what he wore in the first robbery.  Moreover, the identification testimony here is stronger than was the identification testimony in Foutz.  This is directly attributable to the testimony of Isom's wife, Sadie Isom.  Perhaps one of the most compelling distinctions, however, concerns the alibi testimony.  Foutz produced as an alibi witness a Washington police

16

cadet who "testified with considerable certainty and specificity that Foutz was with her in Washington at the time of the [first] robbery." Foutz, 540 F.2d at 735. His alibi witness for the second robbery, however, "was unable to account for Foutz' whereabouts at the time of the robbery." Id. In contrast, Isom's alibi witness was unable to state with any specificity whether Isom was at work on the specific days, much less the specific times, that either of the two robberies occurred.

In short, although it is true that the Federal Rules of Criminal Procedure "are designed to promote economy and efficiency and to avoid a multiplicity of trials," Bruton v. United States, 391 U.S. 123, 131 (1968), we are of the strong opinion that the consideration of one's constitutional right to a fair trial cannot be reduced to a cost/benefit analysis. Thus, while we are concerned with judicial economy and efficiency, our overriding concern in an instance such as this "is that [the] jury consider only relevant and competent evidence bearing on the issue of guilt or innocence" for each individually charged crime separately and distinctly from the other. Id. Nevertheless, even after having carefully considered these concerns, we are still convinced that the district court did not err.

Any prejudice Isom suffered by having the two robbery charges joined into one trial is substantially mitigated by the fact that much of the evidence of one robbery would be admissible in the

other.  Thus, we are unpersuaded that the district court's decision to deny Isom's motion to sever amounts to an abuse of discretion. Accordingly, we will affirm the district court on this issue.


## C.  Photo Line-up

"We review legal conclusions involved in the district court's suppression determination <u>de</u> <u>novo</u> but review factual findings underlying the legal conclusions subject to the clearly erroneous standard."  <u>United States v.  Rusher</u>, 966 F.2d 868, 873 (4th Cir. 1992) (citing <u>United States v. Ramapuram</u>, 632 F.2d 1149, 1155 (4th Cir. 1980)).

When called upon to review the admissibility of challenged identification testimony, we undertake a bipartite analysis. First, the appellant "must prove that the identification procedure was impermissibly suggestive.  Once this threshold is crossed, the court then must determine whether the identification was nevertheless reliable under the totality of the circumstances." <u>Holdren v. Legursky</u>, 16 F.3d 57, 61 (4th Cir. 1994) (citations omitted).  If the court concludes that the identification procedure was not impermissibly suggestive, then we will go no further. <u>Harker v. Maryland</u>, 800 F.2d 437, 444 (4th Cir. 1986) (ending analysis after finding photographic array and show-up not impermissibly suggestive).  If, however, we find that the identification was impermissibly suggestive, we will then determine

whether, under the totality of the circumstances, "there is 'a very substantial likelihood of irreparable misidentification.' " <u>Manson v. Brathwaite</u>, 432 U.S. 98, 116 (1977) (quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)).

In deciding on the admissibility of the photo line-up, the district court stated:

> It occurs to me, from looking at these photographs, that it is a series of photographs of individuals perhaps somewhat close in age, it is a picture of six members of the black race, it is a picture of – five of the individuals have very short hair, one – not the Defendant – has longer hair. Four of the pictures seem to be looking essentially at the camera, that's number two, three, four, and five, of which the Defendant is a member.  If it could be argued that the Defendant is not looking at the camera, but is looking slightly away from it, then he would join the group of one and six.  So, he is either four out of six who are looking at the camera, or he is three out of six who are looking slightly away from the camera.  Nothing suggestive about that, as has not been argued by the Defendant.

> The only thing that is suggestive here is the tilt of the head that makes this unduly suggestive.  Number five is pointed up, and has his head tilted a slight bit, and number four is a picture taken of an individual from approximately the same point of view and front of the individual as is number two.  He doesn't have – number four does not have his head tilted back, and number three may have a slight tilt, but I won't find that.

> It occurs to me that what is set forth in these pictures is not sufficient to make this picture unduly suggestive. Two of the individuals have T-shirts on, three of the individuals have shirts, one of the individuals has a sweatjacket, sweatshirt with a hook for it.  Each of the individuals has at least some facial hair, unless it is number six, and he probably does not from looking at this photograph.

19

> The Court finds from the review of this initial outlay of six photographs that there is nothing so unduly suggestive about the Defendant as to prejudice his rights to a fair photo identification.

(J.A. at 78-79.)

Cross-examination of the photo identification witnesses exposed any possible flaws to the attention of the jury. The weight and trustworthiness of the identification testimony was properly left to the jury. For these reasons, we hold that the district court committed no reversible error in admitting the photo array or the in-court identification testimony.

### D. Extensive Questioning by Trial Court

"[W]here the claimed error is one of trial interference by the judge, we may not intervene unless the 'judge's comments were so prejudicial as to deny [the defendants] an opportunity for a fair and impartial trial.'" United States v. Godwin, 272 F.3d 659, 673 (4th Cir. 2001)(citing United States v. Gastiaburo, 16 F.3d 582, 589-90 (4th Cir. 1994)(citing Stillman v. Norfolk & W. Ry. Co., 811 F.2d 834, 839 (4th Cir. 1987))). In a case such as this, however, where the defendant failed to properly object, we will review the defendant's contentions of judicial interference for plain error. Id. (citing United States v. Castner, 50 F.3d 1267, 1272 (4th Cir. 1995)). "[A] fair trial, in the constitutional context, is one

20

'whose result is reliable.'" Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

Isom argues that the trial court involved itself too heavily in the examination and cross-examination of Ghattan.  According to Isom, the court's line of questioning  "did nothing but make Mr. Ghattan look like a dishonest businessman in front of the jury." (Appellant's Br. at 37.)  "The Judge's cross-examination of Mr. Ghattan prejudiced the jury against both the witness and, by association, Bennie Isom, the Defendant." Id.

We have reviewed the transcript of the trial for this case and find no reversible error in regards to this issue.  To a large degree, the court appears to have been primarily concerned with having Ghattan clarify his answers or having him answer the questions that were asked of him.  In fact, the trial court also interjected itself into the questioning of at least two of the Government's witnesses.  Moreover, there is nothing to indicate that the district court exhibited a hostile attitude toward Isom or Isom's counsel.  For these reasons, we will affirm the district court on this issue.


E. Admission of Isom's letter

Isom contends that the district court erred in submitting to the jury Isom's July 9, 2003, letter, to his alibi witness,

21

Ghattan. More specifically, Isom maintains that the trial court should not have allowed into evidence the portion of the letter that reads "I am going to own a portion of Greensboro! $$$$$$$$$$" According to Isom, the dollar symbols at the end of the letter created substantial prejudice that was not outweighed by the probative value of the letter. We disagree.

The district court's evidentiary rulings are entitled to substantial deference and will be reversed only in circumstances in which there has been a clear abuse of discretion. See United States v. Russell, 971 F.2d 1098, 1104 (4th Cir. 1992). We will find an abuse of discretion in this arena only when the district court acted "arbitrarily or irrationally." United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993). Simply stated, we are unable to find that the trial court abused its discretion in admitting this letter into evidence.

The Federal Rules of Evidence provide that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. No such circumstances are present here.

In the letter, Isom includes the dates and the approximate times of each of the robberies. Immediately following this information is a statement that "I'm not worrying as long as I was

22

at work 'it [doesn't] matter.'"  Then, just after requesting that Ghattan "bring [Isom] $70," Isom writes "I am going to own a portion of Greensboro! $$$$$$$$$$"

The letter, when considered in its entirety, and coupled with the visitation logs indicating that Ghattan had visited Isom at the jail at least four times between the time of arrest and trial, convinces us that the district court did not err in admitting the letter in its entirety.

The trial court explained, "I think [']own a portion of Greensboro['] could be construed to be [']you help me here and I am going to be rich, and therefore you might be rich, too.[']" (J.A. at 597.)  We agree.

The letter in general, and the last line in particular, are relevant for the jury's consideration as to the credibility of Ghattan's testimony, specifically, whether he had any motive to be untruthful while testifying in this trial.  While there is other evidence in the record that addresses Ghattan's dishonest business practices, we cannot find that the letter evidence is cumulative since the other evidence is not concerned with his motive to be untruthful in this particular case.

## F.  Other issues

We have considered the other issues raised by Isom in his supplemental materials.  Because we find them to be wholly without merit, we decline to address them herein.


## III.  Conclusion

For the foregoing reasons, Isom's conviction is affirmed.

<u>AFFIRMED</u>
