**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry Sinclair WILLIAMS, Defendant–Appellant. (Two Cases)**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Wayne Edward JOYNER, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael Wendell BEST, Defendant–Appellant.**

Nos. 92–5382, 92–5497, 92–5498 and 92–5503.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1993.

Decided Dec. 1, 1993.

---

Warren Gary Kohlman, Kohlman & Rochon, Washington, DC, Paul Peter Vangellow, Falls Church, VA, argued, for defendants-appellants.

Brian C. Plitt, Washington, DC, of counsel, for defendant-appellant Joyner.

Charles Anthony O'Reilly, Sp. Asst. U.S. Atty., argued, Alexandria, VA (Kenneth E. Melson, U.S. Atty., John P. Rowley, Asst. U.S. Atty., of counsel, for plaintiff-appellee.

Before MURNAGHAN, WILKINS, and LUTTIG, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

Defendants Larry Sinclair Williams and Wayne Edward Joyner were convicted of conspiracy to commit a bank robbery under 18 U.S.C. § 371, armed bank robbery under 18 U.S.C. § 2113(a) and (d), use of a firearm in relation to a crime of violence under 18 U.S.C. § 924(c), and possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). Defendant Williams was convicted of an additional count of armed robbery. Defendant Michael Wendell Best was convicted of conspiracy to commit bank robbery under 18 U.S.C. § 371 and possession of

a firearm by a convicted felon under 18 U.S.C. § 922(g)(1).

The United States District Court for the Eastern District of Virginia, Alexandria Division entered the convictions under which Williams and Joyner were each sentenced to 562 months imprisonment and Best to 180 months.

Defendants appeal their convictions arguing, *inter alia,* that they were arrested without probable cause, that the evidence obtained as a result of the illegal arrest and subsequent search should have been suppressed, and that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), requiring disclosure of material evidence favorable to defendants, should apply to pretrial suppression hearings. Finding that there was a substantial basis for the district court to conclude that probable cause to arrest existed and that the resolution of the Brady matter would not be relevant to the outcome of the case, we affirm the district court's decision.

I

Facts

The facts surrounding the arrest of the defendants on January 16, 1992 indicate that the police had probable cause to arrest the defendants.

Between November 1 and January 16, 1992, a series of bank robberies took place in the Arlington area. As of mid-January, investigating officers were looking for four black males in a white, four door, jeep-like vehicle who were suspected of committing the robberies. The robberies shared a common *modus operandi* including the use of firearms, similar procedures, and the use of latex gloves and ski masks with eye holes cut into them. Witnesses described four black males: one who waited in the car, one who guarded the entrance with a firearm, and two who went behind the counter to steal the money. Witnesses to the first five robberies identified a light colored Chevette-type vehicle, while witnesses to the January 7th robbery described a white, four door, Jeep-like automobile with a Maryland license plate. Two witnesses to the robbery on January 7th

gave slightly different accounts of the perpetrators and the getaway car. A customer who was in the Crestar Bank on January 7th while it was being robbed was able positively to identify defendant Williams.

Donald Sneed, one of the four men arrested on January 16th but not a defendant at the trial, entered into a plea agreement with the government and testified to the conspiracy between the defendants to rob a bank sometime between January 14th and 16th. Sneed testified that he accompanied Williams, Joyner, and Best when they drove to Arlington to search for a bank to rob on the morning of the 16th. After casing First American Bank, Best and Williams agreed "it didn't feel right," so they decided to return to Washington, D.C.

While in Arlington, the defendants were in the vicinity of the Crestar Bank that was robbed on January 7th. Their car was identified by Ruth Kossler, the aunt of FBI agent Susan Kossler. Ruth Kossler called the FBI with a description of the white Mitsubishi Montero, the license plate number, and the whereabouts of the car. Catherine Catherwood, an investigating officer on the tactical squad, received the updated lookout from Corporal Bruce Hackert, also of the Arlington County Police, who told Catherwood that he had received the report from the FBI. Later that afternoon, Officer Catherwood spotted the white Mitsubishi Montero as it drove slowly past the First American Bank that she was surveilling. After observing the four men for a period of time, and calling for back-up, she and her fellow officers executed a vehicle breakdown stop of the Montero and arrested all four men.

II

Probable Cause

■■■ Police officers can make warrantless arrests as long as they act on the basis of probable cause. Probable cause "to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit

an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). The evidence needed to establish probable cause is more than a mere suspicion, rumor, or strong reason to suspect but less than evidence sufficient to convict. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963); *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983). According to *Fisher*, the information acted upon by the police must not apply to any number of persons and must reasonably single out the person or people to be arrested. *Id.*

▇▇▇ *Illinois v. Gates* established the "totality of the circumstances" test for establishing probable cause to obtain a warrant when relying on an informant. Rejecting the two-prong *Aguilar/Spinelli* test,[1] the Court held that an informant's veracity, reliability and basis of knowledge are all highly relevant to a probable cause finding, but "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case...." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). For example, under the totality of the circumstances test, unimpeachable veracity may offset a lack of demonstrated reliability when the police are dealing with a new informant. The Court emphasized that probable cause is a practical, nontechnical concept based on probabilities and common sense. Although *Gates* outlines the probable cause necessary to support a warrant, the underlying principle and the totality of the circumstances test have been applied to probable cause for a warrantless arrest as well. *United States v. McCraw*, 920 F.2d 224 (4th Cir. 1990). An appellate court makes an independent judgment as to the legality of the arrest, but factual findings made by the trial court will not be disturbed unless clearly

erroneous. *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir.1990).

▇▇ The defendants argue that the police officers arrested them without probable cause. Their assertion is based on the following two arguments: 1) the tip on which Officer Catherwood relied came from Ruth Kossler, the aunt of an FBI agent, who was not a witness to any of the robberies, and the information was, therefore, unreliable; and 2) the government withheld testimony and evidence at the suppression hearing that would have undermined the judge's finding of probable cause.[2] Because, allegedly, the arrest was effected without probable cause, all of the incriminating evidence (including latex gloves, ski masks with eye holes cut into them, two guns, and dye stains matching the dye packs from local banks) should be excluded because it constitutes fruit of the poisonous tree.

The defendants' contentions do not undermine the district judge's finding of probable cause at the suppression hearing. First, the defendants have argued that the updated lookout based on information provided by the FBI agent's aunt was not obtained from an eyewitness to the robbery and was, consequently, unreliable. The conclusion does not follow from the premise. Reliable tips can be given by citizens other than those who witness crimes. Under *Illinois v. Gates*, the court may consider the informant's basis of knowledge, her veracity, and the reliability of her information. The court must consider the totality of the circumstances surrounding the arrest.

The court's finding of probable cause was based soundly on the following facts. An eyewitness to the January 7th robbery reported that he saw a white, four-door jeep-like vehicle with Maryland tags and a license plate with the numbers 382432–M leaving the

---

1. *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Both of those decisions have been overruled by the Supreme Court.

2. Among the evidence allegedly withheld were the following circumstances: 1) one witness to the January 7th robbery testified that he saw three men and another individual with long hair that could have been a woman leaving the bank; 2) another witness testified that the getaway car

scene of the crime.[3] Officer Catherwood testified that witnesses had identified the robbers as four black males. Ruth Kossler had read about the robberies and the eyewitness reports in the *McLean Providence Journal* and discussed them with her niece, FBI Agent Susan Kossler. Ruth Kossler provided the FBI with an updated lookout on the morning of January 16th. She spotted four black males in the white jeep-like vehicle described in the paper exactly one block from the Crestar Bank that had been robbed on January 7th.[4] She followed it, copied the license plate, and phoned her niece at the FBI. The police ran a check on the license number, 389432–M, and found that it did come back to a white Mitsubishi Montero identical to the one described by the eyewitness. The tag number reported by the eyewitness differed from the actual tag number by only a single digit. As for Ruth Kossler's veracity, defendants have offered no reason for which she would fabricate the information. Although Officer Catherwood used the tip to spot the white Mitsubishi Montero on the afternoon of January 16th, she relied on the similarity of the updated lookout to the eyewitness report in taking further action. The tip provided by Ruth Kossler did not stand alone.

While surveilling the First American Bank, Catherwood watched the Montero approach in the lane closest to the bank. The Montero drove past the bank at approximately 15–20 miles an hour in a 30 m.p.h. zone. Most drivers on the street were going 35–40 m.p.h. All of the occupants of the Montero were looking in the direction of the bank as they passed. The First American Bank had been robbed previously. Catherwood pulled out and followed the Montero as it sped up, made a U-turn farther down the street, and passed the bank once more. Again, the Montero slowed to 15–20 m.p.h. as it passed the bank. All four occupants looked in the direction of the bank. Catherwood noted the striking similarity between the license plate number that had been reported earlier that morning and that which was reported by the eyewitness to the robbery. She pulled up beside the Montero to observe the occupants. Four black males occupied the car. The passenger in the front seat was wearing a reddish-orange wool ski hat with eye holes cut into it. As several other officers joined Catherwood both behind and in front of the Montero, she watched as the Montero slowed down once again on Washington Boulevard near the First Virginia Bank. All the occupants turned to look in the direction of the bank.[5] Under *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir.1990), "A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest." [6]

was not a white jeep-like four-by-four, but rather a maroon Dodge Caravan.

3. In previous robberies, witnesses had reported seeing a light colored tan or beige Chevette. In the robbery that took place on December 31st, a red dye pack enclosed in one of the money bags stolen from the bank exploded in and around the car in the bank parking lot. The officers hypothesized that the same people were doing all of the robberies because they established a similar *modus operandi* through their interviews with the victims. The fact that the robbers used different cars to accomplish the robberies does not undermine that claim. After the dye pack exploded, it was logical for the robbers to switch vehicles. After the arrest and during further investigation, police discovered that a light colored Pontiac T–1000 registered to Joyner's wife had dye stains in it of the type of dye found in dye packs manufactured by ICI Americas. ICI manufactured the dye pack taken from the First Virginia Bank in December. The police also found dye stains in the Montero that matched the dye pack taken from the Crestar Bank on January 7th.

4. Several banks in the area had been robbed twice.

5. The fact that the defendants slowed down in front of the First Virginia Bank discredits their story that they slowed down in front of the other bank (First American) only because they were looking for someone who was supposed to meet them with gas money. They were not supposed to meet their friend near the First Virginia Bank. The most likely explanation for their unusual driving behavior would appear to be that they were casing the banks.

6. *See also Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960): "In testing the sufficiency of probable cause for an officer's action even without a warrant, we have held that he may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." Ruth Kossler was not an informant in the traditional sense. She did not tip the officers as to

Officer Catherwood's first-hand observations combined with eyewitness reports from previous robberies and the corroborative tip from Ruth Kossler provided the officers with probable cause to make the arrest. The defendants' first contention regarding probable cause is thus without merit.

■ The defendants argue that "it is fundamental that a lawful arrest requires probable cause to arrest a *particular* person." It would be more accurate to say that a constitutional arrest warrant or search warrant requires a particularized description of the person or persons or things to be seized. Case law does not support the contention that a warrantless arrest must be supported by probable cause to arrest a *particular* single individual.[7] A police officer is not required to know the suspect's name or to have a particularized description of his person in order to have probable cause to arrest the suspect. Instead, a reasonable person must believe the suspect has committed or is committing a crime. Here, Officer Catherwood and her colleagues had probable cause to believe that the four black males driving slowly by two banks in a white Mitsubishi Montero with Maryland tags committed the robbery on January 7, 1992 and that these men were preparing to rob yet another bank.

the commission of an on-going or future crime, but rather to the whereabouts of a vehicle allegedly involved in a previously committed crime. (Note: *Jones v. United States* was overruled by the Supreme Court on other grounds in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and other cases).

7. *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), comes the closest to making the point which the defendants have advanced, but the statement is made in the context of police officers exceeding the scope of authorization of a particularized search warrant. The officers had a warrant to search a tavern and the bartender. The Court simply stated that the officers did not therefore have the right to search all the patrons who happened to be in the tavern at the time the search was executed: "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." The passage in *Wong Sun* offered by appellants also deals with the requirements for search warrants.

8. The defendants did not ask for the evidence explicitly. However, even if the material was not specifically requested, *United States v. Agurs* has

## III

### *Brady* Material

■ The defendants have argued that the government improperly withheld evidence relevant to the probable cause determination at the pre-trial suppression hearing. The failure to disclose material evidence violates *Brady v. Maryland*. Under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[8] In Brady, the prosecution withheld relevant information from the defense until after the trial and sentencing were completed. *Brady* requires material information to be turned over to the defense prior to the trial. In the instant case, the materials at issue were turned over to the defense 27 days in advance of trial. The defendants argue, however, that the *Brady* principle should be extended to cover pre-trial proceedings including suppression hearings.

The defendants have made two arguments: 1) that in relying solely upon Officer Cather-

held that a duty may exist to disclose evidence the defense has no way of knowing about or fails to request: "If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). The Court also has noted the following regarding a prosecutor's pre-trial decision to disclose information to the defense: "But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.* at 108, 96 S.Ct. at 2400. "[R]epresentatives of the State . . . 'are under no duty to report sua sponte to the defendant all that they learn about the case and about their witnesses.'" *Id.* at 109, 96 S.Ct. at 2400 (citation omitted). Finally the Court has written, "[T]he omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." *Id.* at 112–13.

wood's questionable testimony, the government improperly withheld information that would establish the unreliability of Ruth Kossler's tip; and 2) that the trial judge would have arrived at a different decision regarding probable cause had relevant eyewitness testimony not been withheld by the government during the suppression hearing.

We have held that the police officers had probable cause to arrest the defendants in light of all of the evidence available to the officers at the time of the arrest including the information that the defendants claim was withheld improperly from the suppression hearing judge. Even if *Brady* were applicable in the context of a pretrial suppression hearing, application of the law to the facts of the instant case would not require a different result. The suppression hearing judge found Officer Catherwood's testimony credible. The evidence allegedly withheld by the government regarding conflicting eyewitness reports was not material to the determination of probable cause, nor was it relevant to guilt or punishment. In light of the inconsequential nature of the *Brady* case to these proceedings, we assume *arguendo* but decline to address definitively on the merits the issue of whether *Brady* should call for disclosure of material evidence at pre-trial suppression hearings.

 Generally speaking, findings of fact at suppression hearings are accorded great deference and will not be disturbed unless they are clearly erroneous. *United States v. Logan*, 949 F.2d 1370, 1379 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992).

The defendants argue that the government violated *Brady* with respect to both Officer Catherwood's "misleading" testimony and the omission of testimony by Ruth Kossler during the suppression hearing. Contrary to defendants' assertions, Ruth Kossler did not make any exculpatory statements that could have shed doubt on the defendants' guilt. That argument is without merit.

Further, the defendants have mischaracterized Officer Catherwood's suppression hearing testimony. The defendants described Catherwood's testimony as follows,

> Officer Catherwood recalled that, earlier on January 16th, she had received an updated lookout from the FBI indicating that, on the morning of January 16th, a witness, who had been at the scene of the last robbery (i.e., on January 7th, 1992) had made a *second* sighting of the getaway vehicle that morning in McLean, Virginia carrying four black men and identified it as a white, 4 door Mitsubishi Montero with Maryland license plate number 389432–M.

In fact, Officer Catherwood testified that she received the information regarding the updated lookout initially from another officer, Corporal Hackert. The Corporal told her that he had received the information from the FBI. In response to a question by the trial judge regarding the source of the information, Catherwood said that, as of the date of the hearing, she understood that the information came from an aunt of an FBI agent that worked in the building next to the bank that was robbed. She did not know the source of the FBI's information until long after the arrest. The court asked if the aunt had witnessed one of the earlier robberies, and Officer Catherwood responded, "I believe so." Pressing her further, the Court asked, "And had she seen the previous vehicle?" Catherwood answered, "I believe so. I don't know that."[9] Catherwood's denial of knowledge regarding the aunt's status as an eyewitness to the earlier robbery ended that line of questioning. Contrary to defendants' assertions, then, Catherwood did not testify that it was a second sighting, nor did she state that the aunt had been a witness to a prior robbery.

The defendants contend that the district court found probable cause solely on the basis of Catherwood's testimony and that the reliability of the report of a second sighting was "quite clearly the most important fact

---

9. The defendants asserted that Catherwood's response was "utterly untrue, and the government surely knew that. We [*i.e.,* the defendants] submit that the government had a clear duty to immediately set [sic] the record straight, so that the court would know where the tip came from." They offer no evidence to support their understanding of what the government did or did not know at the time of the suppression hearing.

for proving the police had probable cause." First, the district court did find Catherwood's testimony sufficient to establish probable cause. Second, Catherwood did not testify to a second sighting. Finally, there is simply no basis for the argument that the alleged second sighting was the most important factor in the judge's decision. In fact, Catherwood testified regarding the rash of bank robberies, evidence collected from the previous robberies including eyewitness testimony, and minute details leading up to the decision to arrest the defendants on the afternoon of January 16th. Her testimony supported the trial court's finding of probable cause.

The defendants argue that the trial court would have had little reason to find the arrest justified by probable cause had the trial court known that the updated lookout was not based on a second sighting by a witness of any of the previous robberies. In fact, the court did have reason to know that Catherwood was unsure about the status of the aunt who relayed the information to the FBI. She did not know who the source of the information was at the time she made the arrest. Her testimony is clear on those points. Whether the trial court understood the fact that the aunt may not have been an eyewitness is less clear. In his findings made pursuant to Federal Rule 12(c), the district judge made the following statement,

> And on the 16th, ... Officer Catherwood received additional information given to her by the corporal orally and later by radio apparently from—to her from the FBI. She learned **later on** that it had come to the FBI through the aunt of an agent **who had observed or had been witness to an earlier robbery on the 7th**....

Although Catherwood stated during her testimony that she did not know whether the aunt was an eyewitness, the trial judge came out of the hearing with the impression that Ruth Kossler was, in fact, a witness to the previous robbery. The confusion would appear to result in an erroneous finding of fact.

However, the judge found specifically that Catherwood did not learn that the aunt was the source of the FBI's information until "later on"—long after the arrest. The trial judge found that the police acted with probable cause even though Catherwood did not know who the source of the information was at the time she acted on that information. Whether or not Ruth Kossler was an eyewitness to the earlier robbery had not been established at the time of the arrest.[10] The judge documented all the other evidence upon which Catherwood relied and found, finally, that under the totality of the circumstances test set out in *Illinois v. Gates*, the police had probable cause to make the arrest.

### IV

### Fruit of the Poisonous Tree

 The defendants argued that the physical evidence obtained from the defendants' vehicle on January 16th following the arrest should have been excluded at trial because the arrest was unlawful. As noted above, the arrest was based on probable cause and therefore lawful. The physical evidence obtained from the vehicle was lawfully obtained as a result of a search incident to an arrest. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981); *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir.1988).

### V

We have considered the defendants' contentions 1) that the trial court erred by failing to grant defendants Joyner's and Williams' motion for continuance; 2) that Williams' conviction should be reversed because the government failed to produce, after demand, material discovery as required by the Jencks Act; 3) that the district court improperly failed to grant Williams' motion for severance and misjoinder of counts; and 4) that the court erred in refusing to grant Williams' motion to compel the government to produce samples of his hair that was analyzed by the government so that he could

---

**10.** "Only the facts and circumstances known at the time of the arrest may be considered by the court in reviewing probable cause to arrest."

*United States v. McCraw*, 920 F.2d 224, 227 (4th Cir.1990).

conduct his own independent analysis. None of those contentions has merit.

### 1. Motion for Continuance

 The district court did not abuse its discretion by denying defendants' motions for continuance after Joyner and Williams decided to proceed pro se. Pursuant to 18 U.S.C. § 3161(c)(2) (The Speedy Trial Act):

Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

Appellants Williams and Joyner filed a motion dismissing counsel eleven days before trial. They filed a motion requesting a continuance, relying upon the language of § 3161(c)(2). *United States v. Moya–Gomez*, 860 F.2d 706, 741–42 (7th Cir.1988), *cert. denied*, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989), holds that the thirty day period prescribed by the statute is measured, exactly as the language of the statute indicates, from the moment the defendant chooses to proceed *pro se* or from the time the defendant first appears with counsel. Defendants first appeared with counsel on March 9, 1992. The trial judge denied their motion for a continuance on May 1. The defendants had eleven more days to prepare for trial, rendering a total preparation time of over two months. The judge specifically required counsel for the defense to remain available in an advisory capacity. The trial court's ruling on a motion for continuance is committed to the sound discretion of the trial judge, and the ruling will not be disturbed unless there is a clear showing of abuse of discretion. *United States v. Darby*, 744 F.2d 1508, 1521 (11th Cir.1984), *cert. denied*, 471 U.S. 1100, 105 S.Ct. 2322, 85 L.Ed.2d 841 (1985).

### 2. Material Discovery Under the Jencks Act

 Under the Jencks Act, the government was not required to turn over witness statements during the suppression hearing. The Jencks Act provides in pertinent part:

In any criminal prosecution brought by the United States, *no statement* or report in the possession of the United States which was *made by a Government witness* or prospective Government witness (other than the defendant) *shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.*

The Jencks Act, 18 U.S.C. § 3500(a) (emphasis added). There is not a Jencks Act basis for requesting such materials prior to trial to avoid surprise. In *United States v. Murphy*, 569 F.2d 771 (3d Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978), the Third Circuit wrote "[t]he blunt command of the statute together with the unequivocal legislative history has led to unbroken precedent in the Courts of Appeals denying to district courts the power to compel production of the statements of government witnesses until conclusion of direct examination at the trial. Trial in this context means a proceeding being conducted for the purpose of determining guilt or innocence."[11] As in the instant case, *Murphy* involved a pre-trial evidentiary hearing resulting from a motion to suppress. *Murphy* noted the same unanimous authority in the related context of preliminary probable cause hearings. The court was careful to point out that the result of *Murphy* "in no way impairs the government's constitutional obligations under *Brady v. Maryland.*" *Id.* at 774. As discussed above, the appellants did not assert a viable *Brady* claim. The appellants' argument that the government failed to produce material discovery after demand necessitating a reversal of defendant Williams' conviction is without merit.

### 3. Severance and Misjoinder of Claims

 Ordinarily, people who are indicted together are tried together. *United States v. Clark*, 928 F.2d 639, 644 (4th Cir. 1991). Rule 8(b) governs joinder. The test to determine whether joinder is permissible is whether defendants are alleged to have

---

**11.** The *Murphy* court acknowledged that there is nothing in the Jencks Act which would prevent voluntary pre-trial disclosure of Jencks material by a government attorney. 569 F.2d at 774. *Accord, United States v. Tarantino*, 846 F.2d 1384, 1415 n. 12 (D.C.Cir.1988).

**1080**

participated in the same act or transaction or in the same series of acts or transactions. *United States v. Brugman*, 655 F.2d 540, 542 (4th Cir.1981). Under *United States v. Odom*, 888 F.2d 1014, 1017 (4th Cir.1989), *cert. denied*, 498 U.S. 810, 111 S.Ct. 44, 112 L.Ed.2d 21 (1990), if joinder is proper, the trial judge can use her discretion to determine whether or not to proceed with a joint trial. Rule 14 governs severance and states that the decision to sever is one within the sound discretion of the trial judge. *Id.*

> If it appears that a defendant or the government is prejudiced by a joinder or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires.

The defendant bears the burden of showing that a joint trial would be so unfairly prejudicial that a miscarriage of justice would result. *Brugman*, 655 F.2d at 542–43.

Neither the defendants' claim for severance nor the claim regarding misjoinder has merit.

4. The Hair Sample

Appellant Williams' argument that the court erred in refusing the defendant the opportunity to conduct his own independent analysis of the hair sample is so lacking in merit that it does not warrant further discussion.

### Conclusion

The police officers had probable cause to arrest the defendants. The subsequent search of their vehicle was lawful as a search incident to a valid arrest. The evidence obtained from that search was, therefore, admissible. We decline to address the issue of whether *Brady v. Maryland* should provide the rule of law applicable in the context of a pretrial suppression hearing.

Accordingly, the judgment is

*AFFIRMED.*