**UNITED STATES of America,**

v.

**Byron E. BECKHAM.**

**No. CR. 1:04CR175.**

United States District Court,
E.D. Virginia,
Alexandria Division.

July 16, 2004.

---

LeDora Knight, United States Attorney's Office, Alexandria, VA, for Plaintiffs.

Peter R. Roane, Charlottesville, VA, for Defendant.

### MEMORANDUM OPINION

ELLIS, District Judge.

Following a motor vehicle stop and subsequent search of his vehicle, defendant Byron E. Beckham was arrested and charged with possession with the intent to distribute crack cocaine, in violation of 21

U.S.C. § 841, and possession of a firearm in furtherance of a drug offense, in violation of 18 U.S.C. § 924(c). By pretrial motion, defendant sought to suppress the drugs and firearm recovered from his vehicle, which motion was denied following an evidentiary hearing on June 25, 2004. *See United States v. Beckham,* Criminal No. 1:04cr175 (E.D. Va. June 25, 2004) (Order). Recorded here are the reasons underlying this ruling.[1]

## I.

The record reflects that on Saturday, February 28, 2004, at approximately 7:30 p.m., a Fairfax County Police dispatcher received a report of a 911 telephone call made by an individual located at the Tyson's Galleria Mall in McLean, Virginia. Specifically, the caller had reported that a black male had brandished a firearm at him while both were seated in their vehicles in the upper level parking lot of the mall. The victim described the firearm as a handgun, but he did not know the specific type. The victim also indicated that the man who had pointed the firearm at him was driving a red Escalade with tinted windows and a gold grille, with license plate number A068626. The victim described the suspect in detail as a black male of approximately 22 years of age, 5′10″ in height and 160 pounds. He was reportedly wearing a beige jacket, blue jeans and white tennis shoes. The victim also remained on the phone with the emergency telephone operator and continued to provide information about the suspect for several minutes. For example, the victim reported that the suspect's red Escalade was located on the top deck of the parking lot, that it was circling the parking lot near

a P.F. Chang's restaurant,[2] and later that the vehicle appeared to be preparing to leave the parking lot.

At approximately 7:36 p.m., in response to the victim's 911 report, two uniformed police officers from the Fairfax County Police Department arrived at Tyson's Galleria Mall driving separate marked police cruisers. Specifically, Officer Jeanette Wagner was dispatched to be the lead officer handling the investigation and Officer Josh David was to provide back-up security at the scene. When the officers arrived on the top deck of the parking lot, they observed that the lot was nearly filled to capacity with vehicles. The victim, who was still on the telephone with the 911 emergency operator, immediately flagged the officers down by waving his arms in the air. Officer Wagner then rolled down the driver's side window of her vehicle and heard the victim exclaim to her, "I'm the one that called!" The victim then excitedly pointed out the red Escalade to Officer Wagner; he also identified the driver of the red Escalade as the individual who had allegedly brandished the firearm at him. Officer Wagner visually confirmed that the red Escalade perfectly matched the description that the victim had provided to the emergency telephone operator in the course of the 911 call.

Following the officers' arrival at the scene, the suspect initially directed the red Escalade to the left, but then abruptly turned the vehicle back to the right toward the parking lot exit. Yet, when he realized that the officers' cruisers were blocking the exit, the suspect sharply turned the wheels of the vehicle in a different direction. The vehicle had stopped moving

---

1. The facts recited here are the Court's findings pursuant to Rule 12, Fed.R.Crim.P.

2. Because there are approximately four restaurants located on the top deck of the mall's parking lot, many customers drive in and out of the parking lot throughout the evening. Indeed, the record reflects that on the evening in question, people were entering and exiting the nearby restaurants continuously throughout the incident.

by that time, with its wheels severely canted. Given the suspect's apparent evasive behavior, Officers Wagner and David activated the emergency lights on their cruisers; Officer David lit his vehicle's spotlight on the Escalade, as well. Although it was evening and dark, street lights and the officers' vehicle lights illuminated the scene.

The officers exited their cruisers and initially approached the red Escalade from the front. At that time, Officer Wagner was able to confirm visually that the driver of the vehicle matched the earlier description provided by the victim in all respects. She then ordered the driver—later identified as the defendant—to raise his hands above his head. Although defendant initially complied with this request, he later dropped his left arm below the dash of the vehicle out of Officer Wagner's sight. Officers Wagner and David then drew their weapons and Officer Wagner again instructed defendant to raise his hands above his head. Once defendant complied with this request, Officer Wagner promptly reholstered her weapon. Officer Wagner then approached the driver's side door of the red Escalade and asked defendant to exit the vehicle; Officer David remained on the passenger's side of the vehicle during this time.

After defendant had exited his vehicle, he stepped back near the driver's side rear door. Officer Wagner immediately asked defendant if he had any weapons; she then conducted a brief pat down around his waistband and in his pockets, finding no firearms or other contraband on his person. Defendant apparently stood still for the pat down, but became animated and verbally inquisitive about the reason for the stop. Among other things, he repeatedly moved his arms and hands about and asked the officers why they were embarrassing and humiliating him. At that point, the officers advised defendant that another individual had called in a report that defendant had brandished a firearm in the mall parking lot. Defendant promptly denied the report.

Officers Wagner and David then asked defendant if they could search his vehicle, but defendant declined. Instead, defendant continued to be verbally and physically animated and, on two occasions, he reached for the driver's side rear door of the Escalade as if to demonstrate what had occurred between he and the victim. Throughout this incident, the officers instructed defendant to calm down and to step away from his vehicle. And, when defendant failed to comply, Officer David told defendant that he was going to be placed in handcuffs for his and the officers' own safety. Officer David therefore asked defendant to turn around and to place his hands behind his back, and defendant complied. Officer David then secured the handcuffs around defendant's wrists and moved defendant to the rear of the Escalade, where defendant remained standing.

Once defendant was handcuffed, Officer Wagner conducted a protective sweep of the front driver's compartment of the Escalade and, immediately upon opening the front driver's side door, she noticed that the lid to the center console next to the driver's seat was ajar. Officer Wagner then reached over to lift the lid of the center console and therein discovered a nine millimeter Ruger handgun loaded with between 10 and 15 rounds of ammunition. Officer Wagner immediately exclaimed "Gun!" so that Officer David was fully aware of the situation. After hearing this, Officer David informed defendant that he was being placed under arrest for brandishing a firearm. Only then did Officer Wagner read defendant his Miranda rights and direct him to the backseat of her police cruiser. Notably, from the moment they arrived at the mall parking lot

to the moment the firearm was recovered from defendant's vehicle, Officers Wagner and David were on the scene for no more than five minutes.

The officers remained at the scene for approximately twenty minutes after defendant's arrest, during which time Officer Wagner interviewed the victim of the alleged brandishing incident. The victim advised Officer Wagner that he and the defendant, while seated in their respective vehicles, had engaged in a verbal altercation regarding a vacant parking spot. In the course of this altercation, defendant allegedly pointed a firearm at the victim and stated "You don't want to mess with me." During the interview, Officer Wagner obtained for filing purposes the victim's name, address, telephone number and date of birth. In the meantime, Officer David, assisted by another Fairfax County Police Officer who had just arrived at the scene, conducted a brief search of the red Escalade incident to defendant's arrest. This search revealed a significant quantity of crack cocaine, later determined to weigh approximately 21 grams, hidden in a small compartment behind the center console.

Based on this incident, on April 29, 2004, defendant was indicted on two federal charges, one for possession with the intent to distribute five grams or more of crack cocaine, in violation of 21 U.S.C. § 841 (Count 1) and the second for possession of a firearm in furtherance of a drug offense, in violation of 18 U.S.C. § 853 (Count 2). Following his arraignment on May 17, 2004, defendant filed a pretrial motion to suppress the firearm and drugs seized from his vehicle on February 28, 2004, claiming that his arrest and the subsequent search and seizure of evidence violated his constitutional rights. An evidentiary hearing was held on June 25, 2004, at which the government presented the testimony of Officers Wagner and David and

defendant then testified on his own behalf. Following this testimony and the arguments of counsel, defendant's motion to suppress was denied. *See United States v. Beckham,* Criminal No. 1:04cr175 (E.D. Va. June 25, 2004) (Order). The reasons for this ruling are set forth below.

## II.

██ The legal standards governing a motion to suppress are clear. A defendant has the initial burden of establishing that he had a reasonable expectation of privacy in the area searched or the items seized. *See United States v. Padilla,* 508 U.S. 77, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993); *United States v. Rusher,* 966 F.2d 868, 874 (4th Cir.), *cert. denied,* 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Then, once a defendant has met this initial burden, the government must establish by a preponderance of the evidence that the search and seizure were reasonable under the circumstances. *United States v. Matlock,* 415 U.S. 164, 177–78 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

Here, as a preliminary matter, the government suggests that defendant may not have standing to object to the February 28, 2004 search of the red Escalade, as he cannot establish that he had a reasonable expectation of privacy in the vehicle or in the items seized from the vehicle on that date. In this regard, defendant testified at the June 25, 2004 hearing that the red Escalade is actually titled and registered in the name of his grandfather, Larry R. Smith, with whom defendant resides. Indeed, defendant admitted that the ultimate decision to purchase the vehicle was made by his grandfather, as it was his grandfather who paid the down-payment, and that he merely accompanied his grandfather to Charlotte, North Carolina to select the vehicle. Yet, defendant also testified that he is a listed insured on the policy covering

the vehicle and that he pays for all of the insurance premiums related to this vehicle. He also contributes a small amount of money toward the monthly payments for the vehicle—"not much" in defendant's own words—and additional amounts in cash · for gas and regular maintenance. The record reflects that defendant uses the red Escalade approximately 15–20% of the time, mostly on weekends, and that no one other than he and his grandparents drives the vehicle.[3]

■ In the circumstances, given, *inter alia*, (i) that defendant resides with the blood relative whose name appears on the vehicle's title and registration, (ii) that defendant contributes funds for the payment of gas, maintenance and insurance for the vehicle, (iii) that defendant contributes additional funds, although minimal, toward the purchase of the vehicle, (iv) that defendant is a listed insured on the policy covering the vehicle, and (v) that defendant is in sole possession of the vehicle approximately 15–20% of the time, it is clear that defendant indeed had a reasonable expectation of privacy in the red Escalade at the time of the February 28, 2004 incident and in the items seized from the vehicle in the course of that incident. *See Rusher*, 966 F.2d at 874. Defendant thus has standing to assert the arguments raised in the instant motion to suppress.

**3.** Defendant also testified that he knew the red Escalade contained a firearm and drugs on February 28, 2004, as these were his items.

**4.** *See also Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (recognizing that if an officer believes that the person being stopped "may be armed and presently dangerous," the officer may frisk the person by patting his outer clothing "in an attempt to discover weapons which might be used to assault [the officer]").

**5.** The Supreme Court determined the constitutional parameters of a "protective sweep" of an automobile in *Michigan v. Long*, 463

## III.

The suppression analysis properly begins with the law applicable to investigative law enforcement stops, commonly referred to as *"Terry"* stops in accordance with the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The starting principle in this regard is that a police officer may conduct a brief investigatory stop of an individual "where the officer has reasonable suspicion that criminal activity may be afoot." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir.2004). In other words, "at least a minimal level of objective justification" is required for a Terry stop, a standard significantly less stringent than the probable cause standard. *See id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

■ In addition to the stop itself, it is clear that an investigating officer may frisk an individual for weapons in the course of a *Terry* stop "if the officer reasonably believes that person to be armed and dangerous." *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir.2004) (citations omitted).[4] It is equally clear that an investigating officer may conduct a limited protective search for weapons during a *Terry* stop if the officer reasonably believes that he or she is dealing with an armed and dangerous individual.[5] *See,*

U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983):

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possessed a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049, 103 S.Ct. 3469 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). Because protective sweeps are limited in scope to that which

*e.g., United States v. Baker,* 47 F.3d 691, 693 (5th Cir.) (holding that the search of the passenger compartment of a vehicle, limited to those areas in which a weapon may be hidden, is permissible if the officer possesses a reasonable belief that the suspect is dangerous and that the suspect may gain immediate control of a weapon), *cert. denied* 515 U.S. 1168, 115 S.Ct. 2632, 132 L.Ed.2d 872 (1995).[6]

In reviewing the legality of a *Terry* stop, courts must consider the "totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Mayo,* 361 F.3d 802, 805 (4th Cir.2004) (quoting *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)) (internal quotation marks omitted); *Perkins,* 363 F.3d at 321 (stating that "[i]n assessing a *Terry* stop's validity, we consider the totality of the circumstances"). Relevant to this analysis are various individual factors typically relied on by police officers, including, *inter alia,* "whether the suspect engaged in evasive behavior or acted nervously" at the scene. *Mayo,* 361 F.3d at 805–06 (citations omitted). And, in all cases, a determination of whether sufficient reasonable suspicion exists "must give due weight to common sense judgments reached by officers in light of their experience and training." *See Perkins,* 363 F.3d at 321 (citing *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673). More specifically, a determination of the reasonableness of a

*Terry* stop "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 386–87, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

To this end, while *Terry* stops typically are fairly unintrusive, it is nonetheless true that police officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. For example, it has been recognized, in the Fourth Circuit and elsewhere, that police officers may draw their weapons for protection without transforming an otherwise valid *Terry* stop into an arrest. *See, e.g., United States v. Taylor,* 857 F.2d 210, 214 (4th Cir.1988).[7] The reasonable use of backup officers is also permitted during a *Terry* stop, as "mere numbers do not automatically convert a lawful *Terry* stop into something more forbidding." *United States v. Zapata,* 18 F.3d 971, 976 (1st Cir.1994). And, particularly relevant here, it is also true that "an officer may handcuff a suspect when reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop." *Young,* 355 F.3d at 755 (citing *U.S. v. Crittendon,* 883 F.2d 326, 329 (4th Cir.1989), *Taylor,* 857 F.2d at 213) (quotation marks omitted). Indeed, "drawing weapons, handcuffing a suspect,

---

is necessary to protect the safety of the investigating police officers, they are permissible based on less than probable cause. *See Maryland v. Buie,* 494 U.S. 325, 335 n. 3, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

**6.** *See also United States v. Michelletti,* 13 F.3d 838, 840 (5th Cir.) (recognizing that *Terry* permits reasonable protective searches for weapons where an officer has reason to believe, based upon "specific and articulable facts," that the suspect is armed and danger-

ous), *cert. denied,* 513 U.S. 829, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994).

**7.** *See also Young v. Prince George's County, Maryland,* 355 F.3d 751, 755 (4th Cir.2004) (stating that "police offices may block an automobile and draw their weapons when confronted with a situation in which they have been informed that a passenger fears for his personal safety," without converting a *Terry* stop into an arrest) (citations omitted).

placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir.1995) (citations omitted).[8]

■ In this case, the officers' initial stop of the defendant was clearly warranted under *Terry* based on their reasonable suspicion that he had committed the crime of brandishing a firearm, in violation of Virginia Code § 18.2–282. This suspicion was initially based on a contemporaneous report from the apparent victim of the crime. Later, at the scene, this basis was augmented and strengthened by the victim's further statements and defendant's evasive and animated behavior.[9] And, under the totality of the circumstances presented here, Officers Wagner and David employed reasonable methods of restraint on the defendant and did not cross the line between an investigatory *Terry* stop and an arrest.[10] For example, the detention was very brief, lasting approximately five minutes from the time the officers pulled into the parking lot to the time they recovered the firearm from defendant's vehicle.[11] Moreover, given that defendant re-

**8.** See also *Vargas*, 369 F.3d at 102 (stating that "although under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop, intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers") (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir.2001)) (internal quotation marks omitted); *Flowers v. Fiore*, 359 F.3d 24, 30 (1st Cir.2004) (recognizing that where police officers have information that a suspect is armed and that a crime involving violence may soon occur, "they are justified in using restraints such as handcuffs without causing an investigatory stop to cross over into an arrest") (citing *Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir.1996)).

**9.** See, e.g., *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (where a tip from a known informant that a person sitting in a nearby vehicle was carrying a gun at his waist provided a basis for reasonable suspicion that criminal activity was afoot); *United States v. Terry–Crespo*, 356 F.3d 1170 (9th Cir.2004) (where an emergency 911 call in which a tipster claimed to have been threatened with a handgun a few minutes earlier showed sufficient indicia of reliability to provide police with a reasonable suspicion to justify a *Terry* stop of the suspect); *United States v. Valentine*, 232 F.3d 350 (3d Cir.2000) (where an anonymous tip from an individual who flagged down police officers to report that he had just seen someone with a gun was sufficient reasonable suspicion to detain and investigate the individual), *cert. denied*, 532 U.S. 1014, 121 S.Ct. 1748, 149 L.Ed.2d 670

(2001); *United States v. Christmas*, 222 F.3d 141 (4th Cir.2000) (where a face-to-face tip from a citizen that individuals at a specific location had guns and drugs provided sufficient reasonable suspicion to detain and frisk the individual), *cert. denied*, 531 U.S. 1098, 121 S.Ct. 830, 148 L.Ed.2d 712 (2001).

**10.** The Fourth Circuit has held that "[a] *Terry* or investigative stop can cross the line and turn into an arrest...[if], under the totality of the circumstances, the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'" *Young*, 355 F.3d at 755 (quoting *Park v. Shiflett*, 250 F.3d 843, 850 (4th Cir.2001)). Yet, "[b]rief, even if complete deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *Young*, 355 F.3d at 755 (quoting *Crittendon*, 883 F.2d at 329).

**11.** See *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (noting that in determining the reasonableness of a stop, "it [is] appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicion quickly, during which time it was necessary to detain the [suspect]"); *United States v. Alpert*, 816 F.2d 958, 964 (4th Cir.1987) (noting that "[a]mong the circumstances which must be considered [when determining the reasonableness of a stop] are the duration of time the suspect is delayed by the stop,...whether the police acted diligently,...[and] whether the detention of the subject of the search was unnecessarily prolonged").

portedly had a firearm in his vehicle and was acting in an animated fashion and reaching for the driver's side rear door while standing outside the vehicle, the officers' decision to handcuff defendant for their own personal safety during the investigative stop was objectively reasonable. *See supra* n. 8. It was also reasonable for Officers Wagner and David to draw their weapons briefly when defendant's left arm disappeared out of sight, particularly given the fact that Officer Wagner immediately reholstered her weapon once defendant's left arm was again visible. In sum, the various facts and circumstances of this lawful *Terry* stop illustrate a situation where the police officers responded in an urgent and reasonable fashion to a report of an armed threat that was substantially confirmed by the police officers' firsthand observations at the scene. And, although there may very well be cases where individually reasonable police actions, viewed together as whole, might go beyond the bounds of a *Terry* stop, this is not the case here where the circumstances clearly justified the officers' handling of the situation.[12]

## IV.

■ Defendant's motion to suppress is also properly denied on an alternative ground, namely that the officers had probable cause to arrest defendant on the brandishing charge based solely on the information provided by the victim, combined with their own first-hand observations at the scene. In this regard, it is clear that "[p]olice officers can make warrantless arrests as long as they act on the basis of probable cause." *United States v. Williams*, 10 F.3d 1070, 1073 (4th Cir. 1993), *cert. denied*, 513 U.S. 926, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994). Probable cause to justify an arrest requires "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Put another way, "the question to be answered is whether an objectively reasonable police officer, placed in the circumstances, had a 'reasonable ground for belief of guilt' that was 'particularized with respect to the person to be searched or seized.'" *United States v. Humphries*, 372 F.3d 653, 657–58 (4th Cir.2004) (quoting *Maryland v. Pringle*, 540 U.S. 366, 124 S.Ct. 795, 800, 157 L.Ed.2d 769 (2003)).

■ The quantum of evidence necessary to establish probable cause "is more than a mere suspicion, rumor, or strong reason to suspect but less than evidence sufficient to convict." *Williams*, 10 F.3d at 1074 (citations omitted). It is also important to remember that probable cause "is a practical, nontechnical concept based on probabilities and common sense." *Id.* at 1074.[13] Thus, a determination of whether an officer has sufficient probable cause to arrest a suspect requires an examination of the

---

**12.** *See, e.g., Young*, 355 F.3d 751 (methods of restraint used by police officer conducting investigatory traffic stop, which included handcuffing driver and forcing him down to the ground, did not unnecessarily prolong the detention and transform it into an arrest where driver identified himself as an off-duty FBI agent and stated that he was armed; officer was entitled to protect his safety by taking reasonable measures to disarm driver, and detention lasted less than twenty-five minutes during which time officer verified driver's FBI credentials).

**13.** *See also Humphries*, 372 F.3d at 657–58 (stating that the "probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act") (citing *Pringle*, 540 U.S. at ——, 124 S.Ct. at 799).

totality of the circumstances.[14] And, in assessing the totality of the circumstances, it is appropriate to consider various factors in the probable cause ·analysis, including, *inter alia*, (i) "an officer's practical experience and the inferences the officer may draw from that experience," (ii) a suspect's "[h]eadlong flight" upon noticing the presence of a police officer, (iii) a suspect's evasive conduct short of headlong flight, or (iv) even "seemingly innocent activity" when placed in the context of surrounding circumstances. *See Humphries*, 372 F.3d at 657–58 (citations omitted).

Particularly relevant here is the principle that a finding of probable cause may be based on information provided by a victim or eyewitness to a crime, as "it is well-established that [w]hen an officer has received...information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has· probable cause." *Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir.1999) (quoting *Tangwall v.*

*Stuckey*, 135 F.3d 510, 519 (7th Cir.1998)), *cert. denied*, 530 U.S. 1243, 120 S.Ct. 2688, 147 L.Ed.2d 961 (2000) (internal quotation marks omitted). Indeed, the Fourth Circuit has recognized that "[i]t is surely reasonable ·for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker," as "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself." *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir.1991).[15] Because of this ṣensible principle, "[a]n eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir.1999) (citations and internal quotation marks omitted).[16]

**14.** *See Humphries*, 372 F.3d at 657–58 (citing *Pringle*, 540 U.S. at ——, 124 S.Ct. at 800); *Williams*, 10 F.3d at 1074 (recognizing that a "totality of the circumstances" test is used to establish whether probable cause exists and, in this regard, an "informant's veracity, reliability and basis of knowledge are all highly relevant to the probable cause finding") (citing *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

**15.** *See also Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (stating that "[i]n testing the sufficiency of probable cause for an officer's action even without a warrant, we have held that he may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge"); *Williams*, 10 F.3d at 1075 (recognizing that "[u]nder *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir.1990), '[a] combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause for an arrest' ").

**16.** *See also· Wilson v. Russo*, 212 F.3d· 781, 790 .(3d Cir.2000) (stating that "a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause"); *Gardenhire v. Schubert*, 205 F.3d 303, 322 (6th Cir.2000) (recognizing that "a crime victim's accusation standing alone can establish probable cause") (citing *Ahlers*, 188 F.3d at 370); *Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir.1998) (stating that "[s]o long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place·the alleged culprit under arrest"); *Tangwall*, 135 F.3d at 520 (recognizing that "the law is clear that a believable victim's single identification can provide the basis for probable cause"); *Sharrar v. Felsing*, 128 F.3d 810, 818 (3rd Cir. 1997) (stating that "[w]hen a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause"); *United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir.1991) (recognizing that "once a putative victim...has positively identified her attacker to the police and

This does not mean, of course, that a victim's identification of a suspect or report of a crime is always sufficient, in and of itself, to establish probable cause. To the contrary, "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." *Wilson v. Russo,* 212 F.3d 781, 790 (3d Cir.2000). Moreover, where "information from or about a [putative] victim of crime would lead a reasonable officer to be suspicious," the officer should conduct further investigation before making an arrest. *See Spiegel,* 196 F.3d at 724 (quoting *Hebron v. Touhy,* 18 F.3d 421, 422–23 (7th Cir.1994)). Yet, it is nonetheless true that a victim's report of a crime or identification of a suspect need not be "unfailingly consistent to provide probable cause." *Spiegel,* 196 F.3d at 725.

These principles, applied here, compel the conclusion that Officers Wagner and David had sufficient probable cause to arrest defendant on the charge of brandishing a firearm once they had (i) arrived at the mall parking lot in response to a reported brandishing incident, (ii) been directed to the purported suspect by the victim of the offense, who remained present at the scene, still on the telephone with the 911 emergency operator, (iii) corroborated the detailed description of the suspect and vehicle that had been provided earlier by the victim in the course of the 911 telephone call, and (iv) observed defendant engaging in evasive and agitated behavior at the scene, *i.e.,* attempting to drive his vehicle out of the parking lot upon spotting the officers, moving his arms and hands about in an animated manner and repeatedly reaching for the driver's side rear door once standing outside the vehicle. To be sure, when a victim reports a crime immediately after its occurrence and then points to an individual and exclaims, "he's right there!," as occurred here, a reasonable and prudent police officer would naturally tend to believe that the identified suspect has committed the alleged offense. It is also significant that Officer Wagner was able to confirm, based on her own observations at the scene, the descriptive information provided by the victim earlier in the course of the 911 call; indeed the descriptions matched the defendant and the red Escalade perfectly. Moreover, the victim's credibility was further evidenced by the fact that he remained at the scene of the crime throughout the investigation and willingly provided Officer Wagner with his personal identifying information, thus allowing the officers to contact him and hold him responsible in the event the report turned out to be fraudulent. In these circumstances, because Officers Wagner and David had sufficient probable cause to arrest defendant for brandishing a firearm even before they had located the firearm in defendant's vehicle, defendant's motion to suppress is properly denied. *See, e.g., Torchinsky,* 942 F.2d at 262; *supra* n. 14–15.

An appropriate Order has issued.

they have no reason to disbelieve her, the officers 'need not take any additional steps to corroborate the information regarding the crime before taking action'"); *Grimm v. Churchill,* 932 F.2d 674, 675 (7th Cir.1991) (recognizing that even a single identification by a reliable eyewitness may be sufficient to supply probable cause); *United States v. Maryland,* 479 F.2d 566, 569 (5th Cir.1973) (holding that "information given to law enforcement authorities by the victim of the crime immediately after its occurrence was clearly sufficient to supply probable cause for appellant's arrest").